**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-CV-1571-RMR-KAS

REGAN BENSON,

      Plaintiff,

v.

ENGLEWOOD, COLORADO, a Colorado municipal corporation

and

TAMARA NILES, in her individual and official capacity,
OTHONIEL SIERRA, in his individual and official capacity,
JOE ANDERSON, in his individual and official capacity,
SERGIO RENTERIA, in his individual and official capacity,
BETHANY LAFFERTY, in her individual and official capacity
CORINNE BARNETT, in her individual and official capacity,
JEAN MULDER, in her individual and official capacity,
AARON GLEE, in his individual and official capacity,
CARRIE WATSON, in her individual and official capacity, and
SHAWN LEWIS, in his individual and official capacity.

      Defendants.

---

## FIRST AMENDED COMPLAINT

---

Plaintiff Regan Benson ("Ms. Benson") by and through her attorneys, Stimson LaBranche Hubbard, LLC, brings this action against Defendants Englewood, Colorado, Tamara Niles, Othoniel Sierra, Joe Anderson, Sergio Renteria, Bethany Lafferty, Corinne Barnett, Jean Mulder, and Aaron Glee, Carrie Watson, and Shawn Lewis (collectively "Defendants") on personal

knowledge as to their own activities and on information and belief as to all other matters, and

alleges as follows:

**INTRODUCTION**

1.      Ms. Benson is an outspoken advocate for the homeless in Englewood. She has

advocated on their behalf at Englewood City Council meetings, outside the Englewood Library,

in meetings with Englewood public officials, and elsewhere. In her effort to protect the homeless,

Ms. Benson frequently submits records requests to Englewood and the Englewood Police

Department and records her interactions with Englewood public officials. As a result of her

zealous advocacy, Ms. Benson was well known to the Defendants in this case. In an effort to

stifle that advocacy, the Defendants excluded Ms. Benson from the library, orchestrated multiple

criminal charges against her for engaging in First Amendment-protected activities, excluded her

from Englewood City Council meetings, prevented her from speaking at an Englewood City

Council meeting, and even passed a new policy criminalizing constitutionally protected

recording activity in response to Ms. Benson's advocacy. The Defendants' actions repeatedly

violated Ms. Benson's First Amendment rights.

**JURISDICTION AND VENUE**

2.      This action arises under the Constitution and laws of the United States, including

42 U.S.C. § 1983 and the First Amendment. This Court's jurisdiction is further invoked under 28

U.S.C. §§ 1331, 1343, and 1367. Jurisdiction supporting Plaintiffs' claim for attorney's fees is

conferred by 42 U.S.C. § 1988.

3.      This Court has personal jurisdiction over the Defendants because they reside in Colorado.

4.      Venue is proper under 28 U.S.C. § 1391(b) because all the events giving rise to the claims in this Complaint occurred within Colorado.

## PARTIES

5.      Regan Benson is the executive director of Helping Hands for Dignity, a 501(c)(3) non-profit organization devoted to providing direct outreach to the unhoused population in the Denver Metropolitan Area. At all relevant times Plaintiff was a citizen of the United States and a resident of the State of Colorado.

6.      Defendant Englewood, Colorado ("Englewood" or the "City") is a Colorado municipal corporation.

7.      Defendant Tamara Niles is the City Attorney for Englewood. Ms. Niles is directly appointed by the Englewood City Council. Ms. Niles is named in her individual and official capacities.

8.      Defendant Othoniel Sierra is Mayor of Englewood. Mr. Sierra is named in his individual and official capacities.

9.      Defendant Joe Anderson is an elected member on the Englewood City Council and Mayor Pro Tem. Mr. Anderson is named in his individual and official capacities.

10.     Defendant Sergio Renteria was an employee of the Englewood City Attorney's Office. Mr. Renteria is named in his individual and official capacities.

11.     Defendant Bethany Lafferty was an employee of the City of Englewood assigned to work in the Englewood Library. Ms. Lafferty is named in her individual and official capacities.

12.    Defendant Corinne Barnett was an employee of the City of Englewood assigned to work in the Englewood Library. Ms. Barnett is named in her individual and official capacities.

12.13.  Defendant Carrie Watson is an employee of the City of Englewood who was, at all times relevant hereto, supervisor of the Englewood Library. Ms. Watson is named in her individual and official capacities.

13.14.  Defendant Shawn Lewis is the City Manager for the City of Englewood. Mr. Lewis is named in his individual and official capacities.

14.15.  Defendant Jean Mulder is a POST certified law enforcement officer employed by the Englewood Police Department. Officer Mulder named in her individual and official capacities.

15.16.  Defendant Aaron Glee is a POST certified law enforcement officer employed as a detective with the Englewood Police Department. Officer Glee is named in his individual and official capacities.

16.17.  At all times relevant to this Complaint, each individual Defendant was acting under the color of state law and was a citizen of the United States and resident of Colorado.

## STATEMENT OF FACTS

17.18.  The Englewood Civic Center houses the Englewood Municipal Court, the Englewood Library, and the City's administrative offices including the City Clerk, City Attorney, and City Manager.

18.19.  In recent years, Ms. Benson has focused her efforts on helping the unhoused population in Englewood, Colorado. Ms. Benson assists her clients with housing, helps them obtain services, and navigate service providers. She also assists unhoused clients as they work

through interactions with the criminal justice system, including helping them clear warrants and providing transportation to court.

~~19.~~20.  In conjunction with this work, Ms. Benson frequently does business in the Englewood Civic Center. Her efforts at the Civic Center building include, but are not limited to: submitting records requests with the City Clerk; observing municipal court proceedings; utilizing the public library; transporting clients to municipal court proceedings; observing municipal court proceedings; and assisting clients with obtaining services from the departments at the Civic Center.

~~20.~~21.  In addition to the direct services she provides, Ms. Benson advocates with government officials. Ms. Benson regularly attends Englewood City Council meetings, library meeting, and other public meetings at the Civic Center complex. Ms. Benson frequently speaks at these meetings to advocate on behalf of her clients and be heard on other matters of public interest.

~~21.~~22.  In addition to speaking out at public meetings, Ms. Benson often contacts the City Manager, Members of City Council, City Clerk, and others about Englewood's policies and practices.

~~22.~~23.  Ms. Benson has filed a number of complaints against officers employed by the Englewood Police Department related to their treatment of her and her unhoused clients. Ms. Benson has also assisted her clients in filing their own complaints against police officers.

~~23.~~24.  Ms. Benson often videorecords herself while at the Civic Center complex, including her interactions with public officials and others in the public spaces of the building. These videos are sometimes then posted to her YouTube Channel.

24.25.   As a result of these efforts, Ms. Benson, her advocacy, and her views are well known to Englewood employees and public officials, including each of the Defendants in this case.

25.26.   In 2023, Ms. Benson began regularly attending City Council meetings to voice her opposition to Englewood's policies and practices. Ms. Benson frequently spoke out against Englewood's criminalization of homelessness and advocated for the City to change its policies and practices regarding the unhoused population. Ms. Benson also exposed misconduct by Englewood police officers, some of which she captured on video and posted to her YouTube channel.

26.27.   In January 2024, Ms. Benson stepped up her advocacy in the wake of an incident where Englewood Police Officers ignored multiple pleas to help an unhoused man left on a bench in freezing weather. Ms. Benson ultimately took that man for medical assistance but it was too late to save his foot, which had to be amputated.

27.28.   Ms. Benson met with Englewood City Officials about their management plan for their increasing homeless population. She regularly engaged with the City Manager and his delegates about how to make things better. She also continued to submit requests under the Colorado Open Records Act for records of Englewood business and under the Colorado Criminal Justice Records Act for law enforcement records and bodyworn camera footage.

29.     Ms. Benson frequently posted videos on her YouTube channel of her interactions with Englewood police officers and other city officials. She also continued to attend City Council meetings to voice her views directly to the elected officials. Ms. Benson would often livestream on her YouTube channel as she attended City Council or otherwise engaged with City officials at the Civic Center building.

28.30.  Ms. Benson's primary purpose in recording governmental officials and herself interacting with government officials is transparency and government accountability. Any monetary compensation Ms. Benson receives from the YouTube videos is incidental, minimal, and goes directly into her non-profit, which provides direct outreach to the homeless.

29.31.  As Ms. Benson began publicizing how Englewood was failing its unhoused population and requesting the data needed to back up her claims, Englewood took steps to silence her. As outlined below, Englewood—acting through its top-level decision-makers like the Mayor and City Attorney as well as Englewood police officers and other employees—excluded Ms. Benson from its public meetings, had her prosecuted criminally twice, and adopted policies intended to prevent her from exercising her First Amendment rights.

*Exclusion from Library and First Criminal Prosecution*

30.32.  The Englewood Public Library is on the first floor of the Civic Center Building. The restroom facilities in the Library are open to the public.

31.33.  Since the Library reopened following the COVID-19 pandemic, the Library has implemented various informal procedures to restrict access to the public restroom on the first floor of the Civic Center. These policies disproportionately impact the unhoused population, who relies more heavily on public restrooms and public libraries.

32.34.  Ms. Benson has advocated against the restrictions on access to the public restrooms. She has discussed the restrictions with the library staff, with the City's security guards (who are often the enforcers of these restrictions), the City Manager and City Council. Ms. Benson's advocacy has led to some practices being abandoned or changed.

33.35.  Ms. Benson sometimes records her interactions with City personnel using her cellular telephone and posts those videos on her YouTube page.

34.36.  Englewood employees, including Defendants, follow Ms. Benson's YouTube page. Some employees, including Defendants, have reported being offended by her documentation of interactions with Englewood public officials and have expressed their belief that Ms. Benson should be punished for these recordings.

35.37.  On January 6, 2024, Ms. Benson went to the Library in search of an unhoused woman she was assisting with obtaining services. When Ms. Benson tried to use the public restroom, the City's security guard rudely told her she needed to provide her full name. When she refused, the City security guard denied her access to the public bathroom. Another City official had to intervene and use her staff key to let Ms. Benson into the public restroom.

36.38.  After this encounter, Ms. Benson contacted City Manager Shawn Lewis advocating for the City to abandon its policy restricting access to the public bathroom. City Manager Lewis responded that Englewood was taking steps to address this issue and assured her members of the public would not be denied access to the library bathrooms.

37.39.  Ms. Benson later spoke with the supervisor in charge of security guards at the Civic Center Building. The supervisor told Ms. Benson that no guard was to restrict access to the public restroom and that the guards were not to require that anyone give their name to be allowed access to the public bathroom.

38.40.  Over the next few weeks, Ms. Benson continued to have issues accessing the public restrooms in the Englewood Library. Ms. Benson also heard from her clients that librarians and security guards were making it difficult to use the public restroom, including by requiring them to sign out a key.

39.41.  In February 2024, Ms. Benson submitted a number of requests for bodyworn camera footage related to incidents of police misconduct. Englewood officials repeatedly

changed their policy on how records requests were accepted. When she was finally able to

submit her requests, Ms. Benson was told that she would have to pay thousands of dollars for the

footage to be released.

40.42.  Facing these barriers to accessing public records, Ms. Benson contacted the City

Manager and City Council and informed them that she would be reporting Englewood's abuse of

open records laws to the Attorney General.

41.43.  Council member Anderson has publicly condemned Ms. Benson's open records

requests as a "waste of resources." Councilman Anderson publicly called Ms. Benson's actions

to document police misconduct and abuses of authority a "waste of energy" and a "really sad use

of a life."

42.44.  The animus towards Ms. Benson and her attempts to hold Englewood officials

accountable reached a tipping point in March 2024.

43.45.  On March 4, 2024, Ms. Benson went into the Englewood Library to use the

restroom. She went to the security desk and asked Dameyon Ellegan, the security guard stationed

at the desk in the Library, for the restroom key.

44.46.  Mr. Ellegan asked Ms. Benson to sign a piece of paper and provide her name in

exchange for the key to the public restroom. Ms. Benson told Mr. Ellegan that he was violating

policy by requiring her to sign her name for the key, took the key off the desk without providing

her name, and entered the restroom.

45.47.  As she was leaving the restroom, Ms. Benson began recording on her cell phone

to document Mr. Ellegan's response when she returned the restroom key. Ms. Benson continued

recording her interaction with Mr. Ellegan for the next ten minutes as he spoke with Corinne

Barnett, one of the librarians on duty, and then as he left the library and moved through public

areas on the Civic Center property. The recording ended when Mr. Ellegan entered an employee-only area of the Civic Center Building.

46.48.  At all times during this interaction, Mr. Ellegan was on duty as a security guard at the Englewood Civic Center Building, working on behalf of the City of Englewood, enforcing City of Englewood policies and practices. The entire interaction occurred in public areas of the Civic Center building.

47.49.  The next day, on March 6, 2024, Ms. Benson stood on a public sidewalk outside the library passing out pocket constitutions and informing members of the public about abuses being committed by the City of Englewood and its employees, including by restricting access to the public restrooms.

48.50.  Bethany Lafferty was working at the Library that day. Ms. Lafferty approached Ms. Benson, took a pocket constitution from her and then threw it in the garbage. Ms. Lafferty accused Ms. Benson of being "part of the problem" and told Ms. Benson to stop talking with members of the public about issues involving access to the public restroom.

49.51.  On March 7, 2024, Ms. Lafferty and Ms. Barnett were working at the Library. They each checked Ms. Benson's YouTube channel and saw the videos she had posted from her March 4 interaction with Mr. Ellegan and her March 6 interaction with Ms. Lafferty.

50.52.  Recording the actions of an on-duty governmental official in a public area is clearly established protected First Amendment activity. *See Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022). Handing out pocket constitutions and discussing constitutional rights with members of the public is undoubtedly protected by the First Amendment. *See, e.g., Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980). Despite this clearly established law, Defendants worked together to punish Ms. Benson for her protected expressive activity.

51.53.  After seeing Ms. Benson speaking with members of the public about the bathroom policy and posting her interactions on YouTube, Ms. Lafferty and Ms. Barnett together contacted Assistant City Attorney Sergio Renteria to talk about what they could do to put a stop to Ms. Benson's expressive conduct at the Englewood Civic Center. They both said they wanted to stop Ms. Benson from recording public officials, passing out constitutions, and providing information about her cause to people passing by.

52.54.  After that conversation, Assistant City Attorney Renteria discussed the situation with City Attorney Niles. They each knew that Ms. Benson had committed no crime. Nevertheless, they agreed that Mr. Renteria would contact Englewood Police, ask Englewood Police to investigate, and encourage Englewood Police to file baseless charges that punished Ms. Benson's free speech by assuring the Englewood Police that the Police had the backing of the City Attorney's office. As agreed, Mr. Renteria contacted Englewood Police Officer Jean Mulder and asked her to investigate Ms. Benson's interaction with Mr. Ellegan. Attorney Renteria assured Officer Mulder that she had the backing of Ms. Niles and the City Attorney's Office in punishing Ms. Benson for her expressive conduct.

53.55.  Officer Mulder went to the library and spoke with Ms. Lafferty and Ms. Barnett. On the pretext of investigating an alleged offense, Officer Mulder collected information from Ms. Lafferty and Ms. Barnett to support the unlawful exclusion of Ms. Benson from the library and the issuance of criminal charges against her in retaliation for her expressive activities. Ms. Lafferty and Ms. Barnett expressed their disapproval of Ms. Benson's advocacy efforts and views on homelessness. Ms. Lafferty called Ms. Benson "a known menace" because she advocates for the homeless at the Civic Center.

54.56.  Officer Mulder told the librarians to issue Ms. Benson an exclusion order based on an alleged violation of Englewood's Standards of Behavior. Officer Mulder knew that the purpose of the exclusion order was to punish Ms. Benson for her speech. Officer Mulder assured the librarians that she had spoken with the City Attorney's office and had the City Attorney's blessing to punish Ms. Benson for her speech. Officer Mulder, Ms. Lafferty, and Ms. Barnett agreed to exclude Ms. Benson from the library based on Ms. Benson's free speech activities. Officer Mulder contacted the supervisor of the Civic Center Security Officers. Officer Mulder instructed the supervisor to enforce the exclusion order against Ms. Benson and contact the police if Ms. Benson attempted to enter the library.

55.57.  City Attorney Niles and Assistant City Attorney Renteria further agreed that, as part of the plan to punish Ms. Benson for her speech even though she had committed no crime, Mr. Renteria would contact Mr. Ellegan and encourage him to call the police and make criminal allegations against Ms. Benson. The same day, Assistant City Attorney Renteria contacted Mr. Ellegan and told him to call the non-emergency dispatch line and report Ms. Benson for harassment. Mr. Ellegan has testified under oath that, before receiving this phone call, Mr. Ellegan had no intention of reporting his interaction with Ms. Benson to the City of Englewood or any law enforcement official.

56.58.  After being instructed to do so by the Englewood City Attorney's Office, Mr. Ellegan called Englewood's non-emergency dispatch line. and reported that Ms. Benson had followed him around the Civic Center building while videorecording him. On that recorded phone call, Mr. Ellegan said that he was calling at the request of the City Attorney's Office. Mr. Ellegan was assured that the City already had someone looking into his interaction with Ms. Benson.

57.59.  Detective Aaron Glee was assigned the criminal investigation. Detective Glee knew there was no probable cause for alleging a criminal violation against Ms. Benson. He knew her activities were First Amendment-protected. And he knew that the sole purpose of any criminal charge was to punish Ms. Benson for exercising her free speech rights. Nevertheless, Detective Glee swore out an affidavit stating there was probable cause to believe Ms. Benson violated C.R.S. § 18-9-111(1)(c). On March 13, 2024, Detective Glee requested issuance of an arrest warrant for Ms. Benson.

58.60.  On March 18, 2024, Ms. Benson was charged in Arapahoe County Case Number 24cr1047 with two counts of misdemeanor harassment for following Mr. Ellegan in a public place while recording him and using offensively coarse language during her interaction with him.

59.61.  Englewood police normally would not charge someone with those offenses under similar circumstances. No one else had ever been prosecuted for engaging in that kind of conduct in the Civic Center. The charges were merely a pretext for punishing Ms. Benson for her First Amendment-protected activities.

62.    Ms. Lafferty and Ms. Barnett worked together with their supervisor, Carrie Watson, to issue or cause to be issued a Notice of Ejection/Exclusion to issue from the Library prohibiting Ms. Benson from entering the Library and other parts of the Civic Center Building.

63.    On March 11, 2024, Library Supervisor Carrie Watson issued a Notice of Ejection/Exclusion to Ms. Benson that barred her from entering or accessing the "ENGLEWOOD PUBLIC LIBRARY, SOUTH HALF OF 2ND FLOOR LOBBY FROM STAIRS TO ENTRANCE TO ENGLEWOOD CIVIC CENTER" for a period of 90 days. The Ejection/Exclusion Notice was served on Ms. Benson the same day.

64.    The Ejection/Exclusion Order issued by Supervisor Watson stated Ms. Benson had committed a Tier 2 Violation of the Englewood Code of Conduct by engaging in: (1) "THREATS (including threatening display of any items as a weapon), INTIMIDATION, HARASSMENT (including sexual, written, verbal, or physical harassment, or prolonged staring or following another with intent to harass, or stalking) of others"; and (2) "COMMISSION OF A CRIME: CRS § 18-9-111(1)(c)."

60.65.    Ms. Benson was served with the Notice of Exclusion from the Library. The exclusion notice stated Ms. Benson had violated C.R.S. § 18-9-111(1)(c) by "following another with intent to harass". The basis for this violation was Ms. Benson having spoken "harshly" to the Library's security guard and then following him to the second floor of the Civic Center building despite him asking her not to follow him. Ms. Benson appealed her exclusion and hired counsel to represent her during this appeal.

61.66.    Ms. Benson also retained counsel to represent her in defending the criminal charges and contesting her exclusion from the library.

62.67.    In the criminal case, Ms. Benson's attorney filed a lengthy motion citing the binding case law showing how the First Amendment protects a citizen's right to record public officials performing their official duties.

63.68.    On September 24, 2024, at the motions hearing, the District Attorney dismissed all charges.

64.69.    Ms. Benson's appeal of the exclusion order was set for hearing on October 9, 2024. At the hearing, Mr. Ellegan explained how he had no intention of contacting law enforcement after his interaction with Ms. Benson. He called the non-emergency only after he was instructed to do so by a representative of the Englewood City Attorney's Office. Mr. Ellegan

never wanted Ms. Benson to be prosecuted and had no intention of cooperating with law enforcement's attempt to prosecute her criminally.

65.70.  Mr. Ellegan also testified that Ms. Benson recording him was not a violation of Englewood's Standards of Behavior and was not aware of any prohibition on recording others in the public spaces of the Civic Center.

66.71.  Ms. Benson's appeal of the exclusion order was sustained by the hearing officer on October 14, 2024. The hearing officer found that Englewood had not shown that Ms. Benson violated any Englewood policy or Standard of Behavior when she recorded Mr. Ellegan in the Civic Center Building.

67.    Ms. Lafferty submitted a Privacy Complaint to YouTube and complained that Ms. Benson had posted videos of her without her permission. All such videos were taken in public parts of the Englewood Civic Center building while Ms. Lafferty was at work as a librarian in the Englewood public library.

68.72.  YouTube removed some of Ms. Benson's videos from its platform based on Ms. Lafferty's complaint, which financially impacted Ms. Benson.

*Exclusion from City Council Meetings and Second Criminal Prosecution*

69.73.  On October 7, 2024, two weeks after the criminal charges were dismissed, Englewood continued its persecution of Ms. Benson for protected speech when the City again had her criminally prosecuted, this time for allegedly disrupting a City Council meeting by refusing to provide her city of residence during her public comment during the public comment period.

70.74.   Under the City's Charter, the Mayor is the presiding officer of City Council meetings. Englewood City policy permits anyone who signs up to speak at a City Council meeting. Each person who signs up in advance is given three minutes to address Council.

71.75.   During the public comment period, the presiding officer (the Mayor, or if the Mayor is not present, the Mayor Pro Tem) calls people from the sign-up list one at a time to come forward to the podium.

72.76.   Once at the podium, each person is asked to identify themselves and provide their address or, cross streets or, if they're not from Englewood, their city of residence and then begin their comment.

73.77.   The podium is equipped with a microphone and a three-tier light system. The light turns green when a speaker is recognized by the presiding officer and the speaker's three minutes begin. The light turns orange when thirty seconds remain on the three minute clock and turns red when time has expired.

74.78.   During their three minutes, the speaker can talk about anything they desire so long as the speech does not amount to a true threat. A speaker can address a matter of public concern for the City—such as homelessness—or any other topic they choose.

75.79.   Once the member of the public is recognized by the presiding officer, City Council rules forbid interrupting them. If a Council member has a question for the speaker, the Council person must wait until the person's three minutes are over or until the person has completed their statement.

76.80.   In the months leading up to October 7, 2024, Ms. Benson often refused to provide geographical information at the beginning of her public comment based on her belief that the

requirement discriminates against the unhoused population and discourages them from addressing their public officials.

77.81.  Other speakers have also refused or failed to given their address, cross street orf city of residence. City Council members publicly acknowledged that they did not enforce their own policy. In fact, the Englewood City Council had never interrupted or removed a speaker for failing to provide this information before October 7, 2024.

78.82.  In May 2024, after Englewood had Ms. Benson charged for her protected speech of recording in a public part of the Civic Center building, Councilman Joe Anderson gave a public interview during which he referenced how City Council had discussed enforcing the address rule specifically against Ms. Benson to prevent her from speaking during City Council meetings.

79.83.  On October 7, 2024, two weeks after Englewood's first attempt to have Ms. Benson convicted of a crime for protected speech failed, Ms. Benson signed up to offer comment at the City Council meeting. The Mayor was the presiding officer of the meeting. City Attorney Niles was present in her capacity as City Attorney.

80.84.  The Presiding Officer recognized Ms. Benson and gave her permission to speak. When Ms. Benson's name was called, she approached the podium and gave her name. Consistent with past practice, Ms. Benson did not provide her address, cross streets or city of residence. As it had in the past, the light on the podium turned green and Ms. Benson began her public comment.

81.85.  In violation of City Council policies and procedures, Mayor Anthony Sierra interrupted Ms. Benson during her three minute comment period. Ms. Benson was not

threatening anyone or otherwise crossing any lines with the content of her speech, which focused

on how the criminal harassment charges engineered by Englewood officials had been dismissed.

82.86.  Mayor Sierra interrupted Ms. Benson to demand that she provide her city of

residence. Ms. Benson protested against the interruption, insisting that it was her time to speak.

Mayor Sierra asked her to stop and again requested that she provide her address or city of

residence. Ms. Benson responded, "Excuse me. This is my time and I'm going to make public

comment and I'm going to do it for three minutes uninterrupted."

83.87.  City Council Member Anderson said, inaccurately, that Ms. Benson was violating

the rules and suggested the Council take a break.

84.88.  Mayor Sierra then announced that the Council would "take a break while the City

Attorney and the Police Department figure out a way to control the situation." The majority of

the Council members then left the room. Ms. Benson was about a minute into her public

comment period.

85.89.  While the City Council was on break, Ms. Benson continued to make her public

comment at the podium about Englewood's efforts to criminally punish her for protected speech

and Englewood Library's "class warfare" on the unhoused population.

86.90.  City Council returned after approximately four minutes. Mayor Sierra told Ms.

Benson that her time was up and asked her to leave.

87.91.  Ms. Benson left the podium and moved to the back of the room. Public comment

continued and the meeting progressed as usual.

88.92.  After about ten minutes of watching the Council meeting from the rear of the

room, Ms. Benson left on her own accord.

89.93.  Throughout these events, Ms. Benson was recording her experience on her personal iPhone. Ms. Benson later posted that video to her YouTube channel.

90.94.  That evening, City Attorney Tamara Niles ensured Ms. Benson would be punished for her protected speech at the City Council meeting. Attorney Niles issued an exclusion notice barring Ms. Benson from the room in the Civic Center Complex where City Council meetings are held for 45 days for allegedly violating Englewood's "Standards of Behavior" during her public comment at the Council meeting. City Attorney Niles issued this exclusion notice because she disagreed with the content of Ms. Benson's speech and wanted to retaliate against Ms. Benson for her speech.

91.95.  City Attorney Tamara Niles also submitted a witness statement to law enforcement in which she inaccurately stated that Ms. Benson had not been recognized by the Mayor before beginning her public comment and inaccurately represented that Ms. Benson was not legally authorized to speak at the City Council meeting. Ms. Niles knowingly submitted this false report because she disagreed with the content of Ms. Benson's speech and she wanted to retaliate against Ms. Benson for her speech.

92.96.  On October 8, 2024, based on City Attorney Niles's witness statement, Englewood Detective Aaron Glee had sought an arrest warrant for Ms. Benson alleging that she had violated C.R.S. § 18-9-110. Ms. Benson was criminally charged in Arapahoe County Criminal Case Number 24M4496 with two counts of violating C.R.S. § 18-9-110.

93.97.  Englewood police would not normally charge someone with those offenses under similar circumstances. Detective Glee knew that the charge was pretextual, Ms. Benson's speech was constitutionally protected, and the charge's only purpose was to punish Ms. Benson for her speech and stop her from exercising her free speech rights in the future.

94.98.  Ms. Benson hired an attorney to appeal her exclusion from City Council meetings and defend her in the criminal case.

95.99.  The District Attorney ultimately dismissed the case because Ms. Benson's actions were protected by the First Amendment.

96.100.       At the appeal of the exclusion order, City Attorney Niles testified and admitted that, before October 7, 2024, the City had not enforced its rule requiring a speaker to provide their address during public comment. Ms. Niles also admitted that, during her multi-year tenure as City Attorney, no one other than Ms. Benson had previously been stopped in the middle of their public comment period. Ms. Niles also testified that she had never seen City Council take a break in the middle of public comment before the day in question.

97.101.       Englewood hired a different hearing officer for this appeal and, despite Ms. Niles's testimony showing Englewood's retaliatory motive, the hearing officer upheld the exclusion. For the 45-day period between November 7, 2024 and December 22, 2024, Ms. Benson was excluded from the City Council chambers within the Civic Center building.

98.102.       Ms. Benson's exclusion order stated that, if she wanted to attend any public meeting in the Council chambers, she was to call the non-emergency line and request a police escort. On two occasions, Ms. Benson attempted to follow this procedure but was denied access.

99.103.       On November 12, 2024, Ms. Benson called the non-emergency line to request an escort to attend the swearing in of the new Englewood police chief. The dispatcher placed Ms. Benson on hold and was told that they were checking with City Attorney Niles as to whether Ms. Benson was permitted to attend. An hour later, Ms. Benson was told that Englewood would not make an escort available for her to attend the swearing in ceremony. On

information and belief, the request for an escort was denied on the instruction of City Attorney Niles.

100.104.    On November 15, 2024, Ms. Benson was prevented from attending an open hearing because it was held in the City Council chambers. Englewood again denied Ms. Benson an escort. On information and belief, the request for an escort was denied on the instruction of City Attorney Niles.

101.105.    On January 65, 2025, Ms. Benson attended her first City Council meeting after the exclusion order expired. She signed up for public comment prior to the stated deadline. However, Mayor Sierra ended the public comment period early without calling Ms. Benson to speak. Ms. Benson was the only person who was denied the opportunity to offer public comment at this meeting.

*Englewood Passes a Law to Criminalize Ms. Benson's Recording Activity*

102.106.    On October 28, 2024, only two weeks after Ms. Benson successfully appealed her exclusion from the library, City Manager Lewis enacted a new policy that prohibits anyone from video recording inside Englewood public buildings or within 8 feet of building entrances without the consent of all persons whose voice or image is recorded. This order applies to the entirety of the Civic Center building, with an exception for rooms in which a meeting subject to the Colorado Open Meetings Law is being held.

103.107.    The policy provides:

## Video Recording Without Consent

*Effective 10/28/24*

## Administrative Order Prohibiting Video Recording Without Consent

Effective 10/28/24 at 8:00 a.m., no one may video record without the consent of all persons whose voice or image is recorded, within eight (8) feet of entrances or inside the Englewood Civic Center, Pirates Cove, or other buildings owned and operated by the City of Englewood (collectively "City buildings").

## Exceptions

- This Order shall not apply to:
    1. Any room during a meeting subject to the Colorado Open Meetings Law;
    2. Law enforcement and other City public safety officials while performing their official duties;
    3. Recording of law enforcement officials while performing their official duties;
    4. Security cameras; or
    5. Recording which is otherwise specifically authorized, required, or prohibited by applicable law or Court order, including regarding Englewood Municipal Courtroom, pursuant to the Court's June 16, 2017 Standing Order Regarding Electronic Devices in Courtroom.
- Any party renting space within a City building may modify this Order within the rental space, during the rental period.

---

104.108.    Any person who violates the new policy can be served with an ejection or exclusion order. If anyone refuses to vacate the property after being notified they are violating the new policy, they can be criminally prosecuted:

## Violations

Any City staff and/or City-hired private security shall request anyone violating this Order to leave the City building and may issue a City Ejection and/or Exclusion Order. Refusal to vacate the City building upon request, or returning in violation of an Exclusion Order, may constitute a violation of law that may be criminally prosecuted. See Colo. Rev. Stat. 18-9-110(3), Colo. Rev. Stat. 18-4-504.

109.    Englewood enacted this policy in response and to prevent Ms. Benson's lawful, First Amendment-protected recording activity.

105.110.    The policy provides that it was enacted by City Manager Lewis pursuant to the City Manager's authority under the Englewood Home Charter and Colorado law.

106.111.     Based on the threat of exclusion from City buildings and criminal prosecution, Ms. Benson stopped her lawful, First Amendment-protected recording activity at the Civic Center and other City buildings.

*Municipal Liability*

107.112.     The City of Englewood has a custom, policy, or practice of retaliating against Ms. Benson for engaging in speech activity that is critical of the City at public places in Englewood.

108.113.     Englewood public officials repeatedly denigrated Ms. Benson for her First Amendment-protected recording and advocacy in interviews and on social media.

109.114.     Englewood librarians submitted complaints to YouTube about Ms. Benson's First Amendment-protected recording activity.

110.115.     City officials and employees, including the Mayor, City Council, the City Manager, the City Attorney, attorneys at the City Attorney's office, police officers, and Library staff held multiple meetings where they discussed how to stop Ms. Benson's First Amendment-protected recording and advocacy.

111.116.     Englewood lawyers, police, and librarians caused Ms. Benson to be excluded from the library on the basis of her First Amendment-protected recording and advocacy.

112.117.     Englewood lawyers, police, and librarians caused Ms. Benson to be charged with multiple criminal counts – on two separate occasions – on the basis of her First Amendment-protected recording and advocacy.

113.118.      The Englewood Mayor, City Council, lawyers, and police denied Ms.

Benson the opportunity to address City Council on multiple occasions, including on October 7,

2024, November 12, 2024, November 15, 2024, and January 65, 2025.

114.119.      The Englewood Mayor, City Council, City Attorney, and police caused

Ms. Benson to be excluded from all City Council meetings.

115.120.      The City enacted a policy prohibiting video recording at and around the

Civic Center to stop Ms. Benson's recording activity and punish with exclusion and criminal

charges if she exercised her First Amendment rights and violated the policy.

116.121.      The City of Englewood has a custom, policy, or practice of retaliating

against anyone who exercises their First Amendment right to criticize the City.

117.122.      Englewood's Mayor, who is the final policymaker for the City with

respect to who is permitted to address City Council at public meetings. The Mayor is the

Presiding Officer of the City Council. The Presiding Officer calls City Council Meetings to

order. The Presiding Officer is responsible for preserving order and decorum at City Council

meetings. The Presiding Officer states all questions that are before the City Council, announces

the decisions of City Council on all subjects, and signs all ordinances adopted by the City

Council. The Presiding Officer determines questions of process and procedure. The Presiding

Officer determines who can speak at a City Council meeting. No one can speak at a City Council

meeting unless the Presiding Officer first gives them permission. The Mayor, in his role as

Presiding Officer, , repeatedly denied Ms. Benson the opportunity to address City Council on the

basis of the content of her speech.

## STATEMENT OF CLAIMS FOR RELIEF

**Claim I: First Amendment Retaliation (Library Exclusion Order) Against Defendants
Englewood, Watson, Barnett, Lafferty, Mulder, Niles, and Renteria Under 42 U.S.C. § 1983**

118.123.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

119.124.    Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; recording city council meetings and other public proceedings; passing out constitutions and other materials outside the Englewood Library; speaking at city council meetings and other public proceedings; communicating with members of the public outside the library about matters of public concern; communicating with Englewood employees and representatives about matters of public concern; and submitting record requests related to these matters were all expressive activities protected by the First Amendment.

120.125.    Plaintiff's activities and communications described above did not violate any law.

121.126.    Nevertheless, Defendants Englewood, Watson, Barnett, Lafferty, Mulder, Niles, and Renteria retaliated against Ms. Benson for engaging in those activities by orchestrating her exclusion from the library. These Defendants' actions were substantially motivated by Ms. Benson's exercise of her First Amendment rights.

122.127.    The order excluding Ms. Benson from the library issued by Supervisor Watson in coordination with under the direction of Ms. Barnett and Ms. Lafferty at the behest of Officer Moulder, Ms. Niles, and Mr. Renteria was a content-based and/or viewpoint-based restriction on speech. It was a denial of Ms. Benson's right to free speech guaranteed by the Constitution of the United States. By excluding Ms. Benson from the library, Defendants Englewood, Watson, Barnett, Lafferty, Moulder, Niles, and Renteria prevented Ms. Benson from speaking out on a matter of public concern and chilled Ms. Benson from exercising her First Amendment rights.

123.128.    The actions of the Defendants described above occurred while each was acting under color of State law. Defendants' conduct violated clearly established rights belonging to Ms. Benson of which a reasonable person in each Defendant's position knew or should have known.

124.129.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim II: First Amendment Retaliation (First Prosecution) Against Defendants Englewood, Niles, Renteria, Barnett, Lafferty, Mulder, and Glee Under 42 U.S.C. § 1983**

125.130.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

126.131.    Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; recording city council meetings and other public proceedings; passing out constitutions and other materials outside the Englewood Library; speaking at city council meetings and other public proceedings; communicating with members of the public outside the library about matters of public concern; communicating with Englewood employees and representatives about matters of public concern; and submitting record requests related to these matters were all expressive activities protected by the First Amendment.

127.132.    Plaintiff's activities and communications described above did not violate any law.

128.133.    Nevertheless, Defendants Englewood, Niles, Renteria, Barnett, Lafferty, Mulder, and Glee retaliated against Ms. Benson for those activities by orchestrating her charging, arrest, and prosecution based on the false allegations that her interactions with Mr. Ellegan

violated the law. Ms. Benson's actions did not violate the law and there was no probable cause. These Defendants' actions were substantially motivated by Ms. Benson's exercise of her First Amendment rights.

129.134.    Ms. Benson's charging, arrest, and prosecution for her interactions with Mr. Ellegan were a content-based and/or viewpoint-based restriction on speech. It was a denial of Ms. Benson's right to free speech guaranteed by the Constitution of the United States. By orchestrating Ms. Benson's charging, arrest, and prosecution, Defendants Englewood, Niles, Renteria, Barnett, Lafferty, Glee, and Moulder prevented Ms. Benson from speaking out on a matter of public concern and chilled Ms. Benson from exercising her First Amendment rights.

130.135.    The actions of the Defendants described above occurred while each was acting under color of State law. Defendants' conduct violated clearly established rights belonging to Ms. Benson of which a reasonable person in each Defendant's position knew or should have known.

131.136.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim III: First Amendment Retaliation (Second Prosecution) Against Defendants City of Englewood, Sierra, Anderson, Niles, and Glee Under 42 U.S.C. § 1983**

132.137.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

133.138.    Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; recording city council meetings and other public proceedings; passing out constitutions and other materials outside the Englewood Library; speaking at city

council meetings and other public proceedings; communicating with members of the public

outside the library about matters of public concern; communicating with Englewood employees

and representatives about matters of public concern; and submitting record requests related to

these matters were all expressive activities protected by the First Amendment.

134.139.    Plaintiff's activities and communications described above did not violate

any law.

135.140.    Nevertheless, Defendants Englewood, Sierra, Anderson, Niles, and Glee

retaliated against Ms. Benson for those activities by orchestrating her charging, arrest, and

prosecution based on the false allegations that her conduct at the city council meeting violated

the law. Ms. Benson's actions did not violate the law and there was no probable cause. These

Defendants' actions were substantially motivated by Ms. Benson's exercise of her First

Amendment rights.

136.141.    Ms. Benson's charging, arrest, and prosecution for her actions at the city

council meeting were a content-based and/or viewpoint-based restriction on speech. It was a

denial of Ms. Benson's right to free speech guaranteed by the Constitution of the United States.

By orchestrating Ms. Benson's charging, arrest, and prosecution, Defendants Englewood, Sierra,

Anderson, Niles, and Glee prevented Ms. Benson from speaking out on a matter of public

concern and chilled Ms. Benson from exercising her First Amendment rights.

137.142.    The actions of the Defendants described above occurred while each was

acting under color of State law. Defendants' conduct violated clearly established rights belonging

to Ms. Benson of which a reasonable person in each Defendant's position knew or should have

known.

138.143.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim IV – First Amendment Retaliation (City Council Exclusion) Against Defendants City of Englewood, Sierra, Anderson, and Niles Under 42 U.S.C. § 1983**

139.144.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

140.145.    Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; recording city council meetings and other public proceedings; passing out constitutions and other materials outside the Englewood Library; speaking at city council meetings and other public proceedings; communicating with members of the public outside the library about matters of public concern; communicating with Englewood employees and representatives about matters of public concern; and submitting record requests related to these matters were all expressive activities protected by the First Amendment.

141.146.    Plaintiff's activities and communications described above did not violate any law.

142.147.    Nevertheless, Defendants City of Englewood, Sierra, Anderson, and Niles retaliated against Ms. Benson by issuing an Exclusion Order excluding Ms. Benson from city council proceedings for a 45-day period. Ms. Benson's actions did not violate the law and there was no probable cause. These Defendants' actions were substantially motivated by Ms. Benson's exercise of her First Amendment rights.

143.148.    Ms. Benson's exclusion from city council meetings was a content-based and/or viewpoint-based restriction on speech. It was a denial of Ms. Benson's right to free speech

guaranteed by the Constitution of the United States. By excluding Ms. Benson from city council meetings, these Defendants prevented Ms. Benson from speaking out on a matter of public concern and chilled Ms. Benson from exercising her First Amendment rights.

144.149.    The actions of the Defendants described above occurred while each was acting under color of State law. Defendants' conduct violated clearly established rights belonging to Ms. Benson of which a reasonable person in each Defendant's position knew or should have known.

145.150.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim V - First Amendment Retaliation (Denied Permission to Speak at City Council Meeting) Against Defendants City of Englewood and Sierra Under 42 U.S.C. § 1983**

146.151.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

147.152.    Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; recording city council meetings and other public proceedings; passing out constitutions and other materials outside the Englewood Library; speaking at city council meetings and other public proceedings; communicating with members of the public outside the library about matters of public concern; communicating with Englewood employees and representatives about matters of public concern; and submitting record requests related to these matters were all expressive activities protected by the First Amendment.

148.153.    Plaintiff's activities and communications described above did not violate any law.

149.154.    Nevertheless, Defendants City of Englewood and Sierra retaliated against Ms. Benson by not permitting her to speak at the January 65, 2025, meeting, even though they let everyone else speak. Ms. Benson's actions did not violate the law and there was no probable cause. These Defendants' actions were substantially motivated by Ms. Benson's exercise of her First Amendment rights.

150.155.    Ms. Benson's exclusion from city council meetings was a content-based and/or viewpoint-based restriction on speech. It was a denial of Ms. Benson's right to free speech guaranteed by the Constitution of the United States. By denying Ms. Benson the opportunity to speak at the city council meeting, these Defendants prevented Ms. Benson from speaking out on a matter of public concern and chilled Ms. Benson from exercising her First Amendment rights.

151.156.    The actions of the Defendants described above occurred while each was acting under color of State law. Defendants' conduct violated clearly established rights belonging to Ms. Benson of which a reasonable person in each Defendant's position knew or should have known.

152.157.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim VI: Conspiracy to Violate Ms. Benson's Constitutional Rights – All Defendants**

153.158.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

154.159.    Defendants recklessly, knowingly, intentionally, willfully, and wantonly conspired with one another, and others, to deprive Ms. Benson of her First Amendment Rights

under the United States Constitution by taking affirmative steps to retaliate against her for

exercising her free speech speech rights, including, but not limited to:

      a.     Arranging for her exclusion from the library;

      b.     Arranging for her charging, arrest, and prosecution for engaging in First

Amendment-protected recording activity;

      c.     Arranging for her exclusion from city council meetings;

      d.     Arranging for her charging, arrest, and prosecution for engaging in First

Amendment-protected activity in speaking at a city council meeting; and

      e.     Denying her the opportunity to speak at the January 6~~5~~, 2025 city council

meeting.

    ~~155.~~160.     The actions of the Defendants described above occurred while each was

acting under color of State law. Defendants' conduct violated clearly established rights belonging

to Ms. Benson of which a reasonable person in each Defendant's position knew or should have

known.

    161.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff

to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she

was prevented from speaking freely on matters of public concern, among other injuries,

damages, and losses.

**Claim VII: Violation of Ms. Benson's Rights of Freedom of Speech and Freedom of
Association Under Colo. Const. Art. II, Section 10 and C.R.S. § 13-21-131 Against
Defendants Mulder and Glee**

    162.    Plaintiff incorporates by reference the allegations contained in the previous

paragraphs as though fully set forth herein.

163.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Amended Complaint.

164.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

165.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

166.    The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

167.    Plaintiff was engaged in protected speech and associative activity.

168.    Plaintiff's speech and association was on a matter of public concern and did not violate any law.

169.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

170.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiff's speech.

171.    Plaintiff's speech and association occurred at a public forum.

172.    Defendants' conduct was substantially motivated by Plaintiff's exercise of her right to engage in constitutionally protected activity.

173.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the protected rights of Plaintiff.

156.174.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

**Claim VIII: Violation of Ms. Benson's First Amendment Rights (Library Exclusion) Against Defendants Barnett, Lafferty, Mulder, Niles, and Renteria Under 42 U.S.C. § 1983**

157.175.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

158.176.    Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; passing out constitutions and other materials outside the Englewood Library; and communicating with members of the public outside the library about matters of public concern were all expressive activities protected by the First Amendment.

159.177.    Defendants' actions in causing the library exclusion order to issue to Ms. Benson can be expected to chill a reaosnable person from engaging in activity prtocted by the First Amendment and violated Ms. Benson's right to free speech.

160.178.    Ms. Benson's expression was on a matter of public concern and did not violate any law.

161.179.    Ms. Benson's expression occurred at a designated and/or limited public forum.

162.180.    Defendants' actions were a content-based and/or viewpoint-based restriction of Ms. Benson's expression.

163.181.    The actions of the Defendants described above occurred while each was acting under color of State law. Defendants' conduct violated clearly established rights belonging

to Ms. Benson of which a reasonable person in each Defendant's position knew or should have known.

164.182.        Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim IXVIII: Violation of Ms. Benson's First Amendment Rights (First City Council Exclusion) Against Defendants City of Englewood, Sierra, Anderson, and Niles Under 42 U.S.C. § 1983**

165.183.        Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

166.184.        Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees or representatives of Englewood; recording city council meetings and other public proceedings; passing out constitutions and other materials outside the Englewood Library; speaking at city council meetings and other public proceedings; communicating with members of the public outside the library about matters of public concern; communicating with Englewood employees and representatives about matters of public concern; and submitting record requests related to these matters were all expressive activities protected by the First Amendment.

167.185.        Defendants' actions in causing Ms. Benson's exclusion from City Council meetings can be expected to chill a reaosnable person from engaging in activity prtocted by the First Amendment and violated Ms. Benson's right to free speech.

168.186.        Ms. Benson's expression was on a matter of public concern and did not violate any law.

169.187.        Ms. Benson's expression occurred at a designated and/or limited public

forum.

170.188.        Defendants' actions were a content-based and/or viewpoint-based

restriction of Ms. Benson's expression.

171.189.        The actions of the Defendants described above occurred while each was

acting under color of State law. Defendants' conduct violated clearly established rights belonging

to Ms. Benson of which a reasonable person in each Defendant's position knew or should have

known.

172.190.        Defendants' actions and/or omissions caused, directly and proximately,

Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in

that she was prevented from speaking freely on matters of public concern, among other injuries,

damages, and losses.

**Claim IX: Violation of Ms. Benson's First Amendment Rights (City Council Denial of
Opportunity to Speak) Defendants City of Englewood and Sierra Under 42 U.S.C. § 1983**

173.191.        Plaintiff incorporates by reference the allegations contained in the

previous paragraphs as though fully set forth herein.

174.192.        Plaintiff's acts of recording Mr. Ellegan, Ms. Barnett, and other employees

or representatives of Englewood; recording city council meetings and other public proceedings;

passing out constitutions and other materials outside the Englewood Library; speaking at city

council meetings and other public proceedings; communicating with members of the public

outside the library about matters of public concern; communicating with Englewood employees

and representatives about matters of public concern; and submitting record requests related to

these matters were all expressive activities protected by the First Amendment.

175.193.     Defendants' actions in causing Ms. Benson to be the only person not permitted to speak at the January 56, 2025, City Council meeting can be expected to chill a reaosnable person from engaging in activity protected by the First Amendment and violated Ms. Benson's right to free speech.

176.194.     Ms. Benson's expression was on a matter of public concern and did not violate any law.

177.195.     Ms. Benson's expression occurred at a designated and/or limited public forum.

178.196.     Defendants' actions were a content-based and/or viewpoint-based restriction of Ms. Benson's expression.

179.197.     The actions of the Defendants described above occurred while each was acting under color of State law. Defendants' conduct violated clearly established rights belonging to Ms. Benson of which a reasonable person in each Defendant's position knew or should have known.

180.198.     Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

**Claim XI: First Amendment Overbreadth (Administrative Order Prohibiting Video Recording Without Consent ) Against Defendants City of Englewood and Lewis under 42 U.S.C. § 1983**

181.199.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

182.200.    Englewood's Administrative Order Prohibiting Video Recording Without Consent is unconstitutionally overbroad in violation of the First Amendment.

183.201.    The Administrative Order restricts First Amendment-protected speech and expressive activity.

184.202.    It does so in traditional public forums.

185.203.    The Administrative Order was enacted to criminalize Ms. Benson's conduct. Therefore, it has a content-based purpose.

186.204.    The Administrative Order has chilled Ms. Benson from engaging in that conduct; namely, video recording public officials at and around the Civic Center in in other Englewood public spaces.

187.205.    The Administrative Order does not address a significant government interest.

188.206.    It is not narrowly tailored to achieve a significant government interest.

189.207.    It does not leave open ample alternative channels of communication.

190.208.    The Administrative Order caused, directly and proximately, Plaintiff to suffer damages. The Adminstrative Order caused Plaintiff's damages in that she was prevented from speaking freely on matters of public concern, among other injuries, damages, and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award all relief as allowed by law and equity, including, but not limited to the following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages;

d.  Non-economic damages;

e.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f.  Issuance of an Order mandating appropriate equitable relief, including but not limited to:

    i.  Issuance of a formal written apology from each individual Defendant to Plaintiff;

    ii.  The imposition of mandatory training within the City of Englewood City Attorney's Office, City Council, and Police Department, designed to address future similar misconduct;

g.  Pre- and post-judgement interest at the highest lawful rate;

h.  Attorney's fees and costs;

i.  Such further relief as justice requires.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: ~~May 18~~August 15, 2025.

Respectfully submitted,

*s/ Jamie Hubbard*

Jamie Hubbard
Carey Bell
STIMSON LABRANCHE HUBBARD, LLC
1652 Downing Street
Denver, CO 80218
Phone/Fax:    720.689.8909
Email:    hubbard@slhlegal.com

bell@slhlegal.com

*Attorneys for Plaintiff Regan Benson*