IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-CV-1571-RMR-KAS

REGAN BENSON,

    Plaintiff/Counterclaim Defendant,

v.

ENGLEWOOD, COLORADO, a Colorado municipal corporation

and

TAMARA NILES, in her individual and official capacity,
OTHONIEL SIERRA, in his individual and official capacity,
JOE ANDERSON, in his individual and official capacity,
SERGIO RENTERIA, in his individual and official capacity,
BETHANY LAFFERTY, in her individual and official capacity
CORINNE BARNETT, in her individual and official capacity,
JEAN MULDER, in her individual and official capacity,
AARON GLEE, in his individual and official capacity,
CARRIE WATSON, in her individual and official capacity, and
SHAWN LEWIS, in his individual and official capacity.

    Defendants/ Counterclaim Plaintiffs.

---

## Counterclaim Defendant's Special Motion to Dismiss Counterclaims

---

Plaintiff Regan Benson ("Ms. Benson") by and through her attorneys, Stimson LaBranche Hubbard, LLC, moves to dismiss all counterclaims brought by Defendant/Counterclaim Plaintiffs pursuant to Colorado's anti-SLAPP law, C.R.S. § 13-20-1101.

The Englewood Parties admit they filed a counterclaim in this case to retaliate against Ms. Benson after what they call "years of harassment", that includes the the filing of this lawsuit. (ECF No. 24 at 1-2.) The supposed "harassment" to which they object is better known as free

expression and petitioning activity protected by the First Amendment. Ms. Benson emails City officials. She submits records requests. She records public officials while they are on duty being paid with taxpayer money. She goes to City Council meetings and speaks during the public comment period. She is loud. She uses coarse language. And she fights hard on issues she cares about. But speaking your mind to elected officials and high-ranking government employees is not "harassment." It is petitioning that goes to the core of the privileges protected by the First Amendment to the United States Constitution.

Ms. Benson filed this lawsuit because the Englewood Parties have been retaliating against her by manufacturing criminal prosecutions and excluding her from public areas and meetings. The Counterclaims filed by the Defendants are yet another effort to dissuade Ms. Benson from holding them accountable and are precisely the kind of "Strategic Lawsuit Against Public Participation" (SLAPP) the Colorado legislature was targeting when they enacted the anti-SLAPP laws. The Counterclaims should be dismissed.

> *Certificate of Conferral*: The parties have conferred on this motion and stipulated that the first part of the anti-SLAPP test is satisfied here. The parties disagree about whether the Englewood Parties can show a reasonable likelihood of success on their counterclaims and therefore the Englewood Parties oppose this motion.

## FACTUAL BACKGROUND

Regan Benson is the Executive Director of Helping Hands for Dignity, a nonprofit which provides direct outreach to the unhoused population in the Denver Metro area and advocates for policy changes to support the homeless community. (Benson Decl. ¶ 1.) For the last few years, Ms. Benson's work has largely focused on the Englewood area. (*Id*. ¶ 2.) Ms. Benson regularly attends Englewood City Council meetings and participates in public comment, frequently pushing elected officials to do more or do better for their citizens. (*Id*. ¶ 3.) Ms. Benson also

communicates directly with Englewood officials on issues related to her clients, general governance, and law enforcement accountability. (*Id*. ¶ 5.)

One of the ways Ms. Benson promotes government accountability is through her YouTube channel. (*Id*. ¶ 6.) Ms. Benson frequently films her interactions with public officials, including her advocacy at City Council meetings, and posts those videos online with accompanying commentary. (*Id*. ¶ 7.) Many of these videos are highly critical of the Englewood government. Englewood public officials view Ms. Benson as a "menace" and have engaged in coordinated efforts that resulted in her being prosecuted twice: once for recording an Englewood security guard in public parts of the civic center building, and once for refusing to stop talking when she was interrupted by the Mayor during her public comment at the City Council meeting. (*Id*. ¶¶ 8, 12, 18.) Englewood officials also brought two administrative processes against Ms. Benson to ban her from parts of the Englewood civic center. (*Id*. ¶¶ 17, 21.) One of these efforts was successful and Ms. Benson was banned from attending City Council meetings for 45 days. (*Id*. ¶ 21.) Ms. Benson incurred nearly $50,000 in attorney's fees defending against these actions. (*Id*. ¶ 22.)

Ms. Benson filed this lawsuit to hold the City of Englewood and the named Defendants accountable for their actions. (*Id*. ¶ 30.) In furtherance of their efforts to silence Ms. Benson, all of the named Defendants have now filed counterclaims against Ms. Benson.

In the Counterclaims, the Englewood Parties assert Ms. Benson's filing of this lawsuit is an abuse of process and that videos and commentary posted to Ms. Benson's YouTube channel are defamatory and an invasion of privacy. As set forth below, the Englewood Parties have not shown and cannot show they are substantially likely to prevail on any of these Counterclaims. All such claims should be dismissed.

## **LEGAL STANDARD**

The Colorado legislature enacted the anti-SLAPP statute with the expressed purpose to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." C.R.S. §13-20-1101(1)(b). The anti-SLAPP statute declares "it is in the public interest to encourage continued participation in matters of public significance and that this participation should not be chilled through abuse of the judicial process." C.R.S. §13-20-1101(1)(a).

Section 13-20-1101(3)(a) of the Colorado anti-SLAPP statute authorizes a "special motion to dismiss" a "cause of action against a person arising from any act of that person in furtherance of their right of petition or free speech under the United States constitution or the state constitution in connection with a public issue." C.R.S. §13-20-1101(3)(a). This Court has repeatedly held that Colorado's anti-SLAPP law applies to tort claims brought in federal court. *See, e.g., Moreau v. U.S. Olympic & Paralympic Cmte.*, 641 F. Supp. 3d 1122 (D. Colo. 2022).

When considering an anti-SLAPP motion, courts employ a two-step test. First, "the court determines whether the defendant has made a threshold showing that the conduct underlying the plaintiff's claim falls within the scope of the anti-SLAPP statute – that is, that the claim arises from an act "in furtherance of the [defendant's] right of petition or free speech…in connection with a public issue." C.R.S. §13-20-1101(3)(a). The parties have stipulated that the first step of the anti-SLAPP analysis is satisfied in that Ms. Benson's conduct at issue in the Counterclaims is sufficiently connected to a public issue.

At step two, the Court must assess whether the Englewood Parties, as Counterclaim Plaintiffs, can establish a "reasonable likelihood" of prevailing on each of their counterclaims. *Stevens v. Mulay*, No. 19-cv-1675-REB-KLM, 2021 WL 1153059, at *3 (D. Colo. March 26,

4

2021). In making this determination, the Court employs a "summary-judgment-like" standard and the Englewood Parties must present sufficient evidence to satisfy the Court that they are reasonably likely to prevail on their counterclaims. *Coomer v. Make Your Life Epic*, 659 F. Supp. 3d 1189, 1200 (D. Colo. 2023).

## ARGUMENT

For the reasons set forth below, the Englewood Parties cannot demonstrate that there is a reasonable likelihood that they will prevail on their counterclaims.

### I. The Abuse of Process Counterclaim is a Classic SLAPP Suit

The Englewood Parties allege that Ms. Benson's filing of this lawsuit is an abuse of process. (Doc. 24 at 6.) When a claim for abuse of process is premised on the initiation of judicial process, the plaintiff must meet a heightened standard given the First Amendment protection afforded to access to the courts. *Protect Our Mtn. Env't, Inc. v. District Court*, 677 P.2d 1361, 1369 (Colo. 1984) ("*POME*"); *General Steel Domestic Sales v. Bacheller*, 291 P.3d 1, 8 (Colo. 2012). Specifically, a plaintiff must show: (1) Ms. Benson's claims were devoid of reasonable factual support or lacked any cognizable basis in law; (2) the primary purpose of Ms. Benson's petitioning activity was to harass the plaintiff or to effectuate some other improper objective; and (3) Ms. Benson's petitioning activity had the capacity to affect adversely a legal interest of the plaintiff. *POME*, 677 P.2d at 1369.

Ms. Benson's claims are not devoid of reasonable factual support; they are based on materials provided to Ms. Benson through her two criminal prosecutions and two administrative hearings. Ms. Benson has received and reviewed police reports, witness interviews, body-worn camera footage, sworn testimony, and other records. (Benson Decl. ¶¶ 9, 19.) The City Council meetings where Ms. Benson routinely speaks during public comment—and where one of the

5

events at issue in her Complaint occurred—are livestreamed and available on YouTube. The factual allegations in Benson's Complaint derive from and are supported by these materials.

Nor are the allegations made in this case lacking any cognizable basis in law. Ms. Benson was engaged in core First Amendment protected activity—addressing elected officials during a City Council meeting and videotaping in public parts of a government building—and the Englewood Parties punished her for this expression by facilitating two criminal prosecutions and two administrative processes intended to bar her from public buildings. Ms. Benson brings claims based on these events under Section 1983 for violating her First Amendment rights and retaliating against her for exercising her First Amendment rights, both of which have long been recognized as valid causes of action. *See, e.g., Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech). Given the factual support for Ms Benson's claims and their cognizable basis in law, the Englewood Parties cannot show a likelihood of success in meeting *POME*'s first requirement.

On the second *POME* element, the Englewood Parties cannot show that Ms. Benson's primary motivation for filing this lawsuit was to harass them. Ms. Benson has a long history of working to hold Englewood government officials accountable for their actions. (Benson Decl. ¶¶ 2-7.) Ms. Benson filed this lawsuit as part of her efforts to hold the Englewood Parties accountable for what they've done to her, to recoup the money they've cost her, and to challenge a recently-enacted policy that prevents recording in public areas of the Englewood civic center, a policy clearly targeted at Ms. Benson. (*Id.* ¶ 30.)

In the Counterclaims, the Englewood Parties point to Ms. Benson's comments at a City Council meeting the day the lawsuit was filed about how she was excited to watch the litigation

process play out. (ECF No. 24 at 5-6.) It is unsurprising that Ms. Benson would have an emotional response to finally being able to push back against the Englewood Parties' coordinated efforts to silence her and run her out of their city. But Ms. Benson's subjective desire for the Englewood Parties to feel discomfort as defendants to a lawsuit is, at best, an ancillary motive that is incidental to her legitimate purposes for filing the lawsuit. As such, it is insufficient to sustain an abuse of process claim. *Mintz v. Accident & Injury Med. Specialists, PC*, 284 P.3d 62, 66 (Colo. App. 2010) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant.")

Moreover, the Counterclaim fails to satisfy elements for abuse of process, even if the Court does not apply the heightened *POME* standard. Abuse of process requires a showing that the party misused the legal process in some manner. *Active Release Techs., LLC v. Xtomic, LLC*, 413 P.3d 210, 212 (Colo. App. 2017). The Englewood Parties' allegation that "Plaintiff utilizes this proceeding in an improper manner" is conclusory and carries no weight. The Counterclaim does not assert any act Ms. Benson has undertaken in this litigation that "is not proper in the proceeding's regular course." *Mintz*, 284 P.3d at 66. Having failed to allege that Benson engaged in any improper use of this proceeding, the Englewood Parties have not shown stated a claim for abuse of process, much less shown a likelihood of success on their abuse of process claim.

The Englewood Parties' abuse of process counterclaim is classic SLAPP litigation. The Englewood Parties have been transparent with their motivation for the abuse of process claim. The Counterclaim says it was filed stop Ms. Benson's "years of harassment" which it claims "escalated" with the filing of this lawsuit. (ECF No. 24 at 1-2.) The Scheduling Order specifies that their damages are "estimated to total $200,000 through the end of trial incurred from

litigation expenditures resulting from Plaintiff's abuse of process." (ECF No. 39 at 5.) In other words, if Ms. Benson continues pursuing her claims against them, she risks having to pay their entire litigation costs. The Englewood Defendants know Ms. Benson is the director of a small non-profit and does not have hundreds of thousands of dollars to pay them. Their abuse of process claim—accompanied by threats that she will have to pay all of their litigation expenditures—is nothing but another attempt to silence Ms. Benson and dissuade her from continuing to petition the government and the courts.

The Englewood Parties do not state all elements of a Counterclaim, and cannot show they are reasonably likely to succeed on this claim.

## II. The Englewood Parties Are Not Likely to Prevail on Privacy Claims

In their Invasion of Privacy claim, the Englewood Parties assert that Ms. Benson misused their names and likenesses in her YouTube videos without their consent and for her own commercial gain. (ECF No. 24 at 7.) This claim centers on three videos posted to Ms. Benson's publicly available YouTube channel: (1) bodyworn camera footage from the first criminal prosecution showing Officer Mulder interviewing Librarians Lafferty and Barnett, posted October 9, 2024; (2) an audio recording of the Englewood security guard calling the dispatch about Ms. Benson's supposed harassment, which was also produced to Ms. Benson as part of the first criminal prosecution; and (3) a livestream from May 19, 2025 when Ms. Benson attended the City Council meeting and gave public comment about this lawsuit, which had been filed earlier that day. (Counterclaim ¶¶ 16-38.)

As a matter of law, these videos cannot form the basis for an invasion of privacy claim because they relate to matters of public concern. "In the context of invasion of privacy by appropriation of name and likeness, there is a First Amendment privilege that permits the use of

a plaintiff's name or likeness when that use is made in the context of, and reasonably relates to, a publication concerning a matter that is newsworthy or of legitimate public concern." *Joe Dickerson & Assoc. v. Dittmar*, 34 P.3d 995, 1003 (Colo. 2001). "This privilege exists because dissemination of information regarding matters of public concern is necessary for the maintenance of an informed public." *Id*.

Speech touches on a matter of public concern when it can be "fairly considered as relating to any matter of political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Expression that is calculated to disclose inefficiency, impropriety or other malfeasance on the part of government officials generally constitutes a matter of public concern." *Jandro v. Foster*, 53 F. Supp. 2d 1088, 1095 (D. Colo. 1999).

Criminal investigations and prosecutions are matters of public concern. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975) ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions ... are without question events of legitimate concern to the public."); *Dickerson*, 34 P.3d at 1005 (reporting on criminal prosecution exempted from invasion of privacy because related to matter of public concern). Two of the videos posted by Ms. Benson relate to dismissed criminal charges against Ms. Benson; they depict different aspects of law enforcement's investigation into Ms. Benson. (Benson Decl. ¶¶ 12, 15.) As the content of these videos plainly relates to a matter of public concern, they fall within the First Amendment privilege and cannot form the basis for an invasion of privacy claim. *Dickerson*, 34 P.3d at 1004.

The third video depicts Ms. Benson attending an Englewood City Council meeting and addressing the elected officials during public comment period. Ms. Benson speaks with the officials about this lawsuit, which had been filed earlier that day, and their lack of meaningful

9

action to help an unhoused person in the community. (Benson Decl. ¶¶ 27-28.) Speaking directly to elected officials during a public meeting is a classic form of petitioning protected by the First Amendment and is undoubtedly a matter of public concern. *See Moore v. Wynnewood*, 57 F.3d 924, (10th Cir. 1995) (statements to city council at public meeting related to policing matter of public concern); *Jandro*, 53 F.Supp.2d at 1096 (criticism of the qualifications of government personnel at a public city council meeting were privileged as relating to a matter of public concern).

That Ms. Benson receives some minimal profit from posting these videos on her YouTube channel does not change the immunity analysis because it is the content of the videos themselves that matters, not whether there was a profit motive for posting them. *Dickerson*, 34 P.3d at 1004 ("[I]f the contents of an article are newsworthy when published by a local newspaper, then they do not cease to be newsworthy when subsequently communicated by a different sort of publisher."). Moreover, Ms. Benson's videos are not "primarily commercial". She is not selling a product or advertising a service using Defendant's names and images. She posts videos to her YouTube channel to bring light to what elected officials and other public officials are doing on the taxpayer's dime. (Benson Decl. ¶ 6.) Two of the challenged videos were posted shortly after the criminal charges against her were dismissed as part of her efforts to educate the public on see how Englewood officials were targeting her. (*Id*. ¶¶ 11-16.)

Because the videos Ms. Benson posted are newsworthy and relate to a matter of public concern, the videos cannot sustain a claim for invasion of privacy as a matter of law.

### III. The Englewood Parties Cannot Show a Reasonable Likelihood of Prevailing on their Defamation Claim

"Defamation is a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage." *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo.

1994). Under Colorado law, in a defamation case involving public figures or matters of public concern, a claim must satisfy six elements: (1) a defamatory statement; (2) that was materially false; (3) concerning the plaintiff(s); (4) published to a third party; (5) with actual malice; and (6) that caused actual or special damages. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017).

When determining whether a statement is defamatory, the Court must remain cognizant of First Amendment concerns because, as the Supreme Court stated in *New York Times Co. v. Sullivan*, "[w]hatever is added to the field of libel is taken from the field of free debate." 376 U.S. 254, 272 (1964) (internal quotations omitted). In line with this principle, courts have imposed constitutional limits on the types of speech that can be considered defamatory. For instance, public officials and public figures—who often are the topic of expressive speech—are held to a higher standard than private plaintiffs when bringing defamation suits. *Id.* at 292.

Colorado courts employ a two-part test to determine if a statement is defamatory or protected. First, the court must consider whether the statement is "sufficiently factual to be susceptible of being proved true or false." Second, the court decides whether reasonable people would conclude the assertion is one of fact based on: (1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed. *Keohane*, 882 P.2d at 1299. Determining whether a statement is defamatory is a question of law. *Walker v. Associated Press*, 160 Colo. 361, 417 P.2d 486 (1966).

Here, four of the Englewood Parties assert statements Ms. Benson made about them are defamatory. After conferral with counsel for the Englewood Parties, Ms. Benson understands the defamation claim as follows[1]:

- City Attorney Niles and City Manager Lewis assert Ms. Benson defamed them during her public comment at the May 19, 2025 City Council meeting when she said they were "playing fricking cornholie" with each other because this comment suggests they were engaged in sexual misconduct. (ECF No. 24 ¶ 32.)

- Officer Mulder and Librarian Barnett allege that Ms. Benson defamed them when she wrote on YouTube video in connection with the video posted October 9, 2024: "These gals are pretty in touch with each others feelings, obviously something the 'men' of the Englewood PD enjoy." They assert this comment suggests they engaged in sexual misconduct with male Englewood police officers. (ECF No. 24 ¶ 17.)

Neither of these are defamatory statements sufficient to sustain a defamation claim.

"[I]n considering a defamation claim, a court must determine how the [statement] would have been understood by a reasonable or average lay [person]." *Fry v. Lee*, 2013 COA 100, ¶ 34. To constitute *per se* defamation[2], a statement's defamatory nature must be apparent on its face; if a statement constitutes innuendo or its defamatory nature can be understood only with consideration of extrinsic evidence, it is not defamatory *per se*. *Lind v. O'Reilly*, 636 P.2d 1319, 1320 (Colo. App. 1981). Ms. Benson's comment about Lewis and Niles "playing fricking cornholie with each other while Crystal's out here being chased by the cops" does not have any overt sexual meaning. Cornhole is a recreational game people play in their backyards. Ms.

---

[1] Colorado law requires that each publication of a defamatory statement be pleaded in a separate cause of action. *See Lininger v. Knight*, 226 P.2d 809, 812 (Colo. 1951). However, Englewood's attorneys specified in conferral what allegedly defamatory statements were at issue in this claim and both are analyzed here. Given that neither statement can sustain a defamation claim as a matter of law, the Court need not permit amendment of the counterclaims to cure this defect.

[2] Because the Counterclaim does not contain any allegation that the Englewood Parties suffered "special damages", the defamation claim must be considered defamatory *per se*. *See Lind*, 636 P.3d at 1320 (defamation *per quod* requires specifically pleading special damages).

Benson's comment about Niles and Lewis "playing fricking cornholie" was intended to call out these city officials for laughing and joking with each other rather than helping Crystal. (Benson Decl. ¶ 29.) This kind of hyperbole is not a factual statement that can sustain a defamation claim. *See Mink v. Knox*, 613 F.3d 995, 1005 (10th Cir. 2010) (no defamatory statement where no reasonable person would interpret the statement as true); *Bucher v. Roberts*, 198 Colo. 1, 595 P.2d 239, 242 (1979) (noting that "the abusive statement here could not have reasonably been understood to be taken literally or seriously and amounted to no more than rhetorical hyperbole.").

  Moreover, the overall tone of Ms. Benson's public comment shows she was venting her anger and frustration about how Englewood officials have treated her and others, like Crystal, in the community. Such obvious venting "is a signal that her words should not be taken literally or as reasoned accusations." *Keohane*, 882 P.2d at 1301. The Englewood Parties cannot show a reasonable person would interpret Ms. Benson's statements as defamatory towards Niles and Lewis and therefore cannot sustain a defamation claim.

  Ms. Benson's statements about Officer Mulder and Librarian Barnett are similarly not defamatory. No reasonable person would interpret Ms. Benson's statement "these gals" being "in touch with each others feelings" as suggesting sexual misconduct with any male officers. The comment about male officers references the fact that Sergeant Adam Wright calls Officer Mulder his "go to gal". Because a reasonable person would not consider these comments defamatory on their face, this claim fails as a matter of law. *Fry*, 2013 COA 100 at ¶ 34. Moreover, Ms. Benson's statement is not "actionable assertion of fact" sufficient to constitute a defamatory statement. *Keohane*, 882 P.2d at 1299; *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 10 (Colo. 1994). Whether Officer Mulder and Librarian Barnett are empathetic people is

13

not something that can be proven true or false; it is a matter of opinion that largely depends on one's perspective. Were this claim to move forward, the Englewood Parties would be required to prove by clear and convincing evidence that Ms. Benson's statements are materially false. Are they actually intending to show that Officer Mulder and the librarians are not empathetic or do not have feelings of affection towards each other? Are they intending to show—as would be their burden—that the male officers in the Englewood Police Department actually dislike the empathetic personality traits of Officer Mulder or the librarians?

Finally, Ms. Benson's statement about Officer Mulder and the librarians must be read in context with the rest of her narrative posted with the October 9 video. *Brokers' Choice of Am. v. NBC Universal*, 861 F.3d 1081, 1108 (10th Cir. 2017). In this caption, Ms. Benson protests the "witch hunt" these women led that resulted in her being prosecuted for harassment. She rails against Englewood's ongoing discrimination against the homeless population and class warfare. She calls out the government for using taxpayer money to fund these kinds of actions. (Benson Decl. ¶ 12, Ex. 3.) Considering the commentary accompanying the October 9 video as a whole, no reasonable person would conclude that her reference to Officer Mulder and the librarians implies inappropriate sexual contact with male officers.

Because the Englewood Parties cannot show they are likely to prevail on their defamation claim, dismissal is appropriate.

## Conclusion

For these reasons, Ms. Benson respectfully requests that the Court enter an Order granting this Motion and dismissing each of the Englewood Parties' counterclaims with prejudice; and award Ms. Benson her attorney fees and costs as provided in Colorado's Anti-SLAPP statute, C.R.S. § 13-20-1101(4)(a).

Dated: August 29, 2025.

                                                Respectfully submitted,

*s/ Jamie Hubbard*
Jamie Hubbard
Carey Bell
STIMSON LABRANCHE HUBBARD, LLC
1652 Downing Street
Denver, CO 80218
Phone/Fax:    720.689.8909
Email:   hubbard@slhlegal.com
bell@slhlegal.com

*Attorneys for Plaintiff Regan Benson*

15

**Certificate of Service**

      I certify that on August 29, 2025, I electronically filed the foregoing *Counterclaim Defendant's Special Motion to Dismiss Counterclaims* with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

      *s/ Nancy Hickam*
      Nancy Hickam, Paralegal