IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-CV-1571-RMR-KAS

REGAN BENSON,

    Plaintiff/Counterclaim Defendant,

v.

ENGLEWOOD, COLORADO, a Colorado municipal corporation

and

OTHONIEL SIERRA, in his individual and official capacity,
JOE ANDERSON, in his individual and official capacity,
SERGIO RENTERIA, in his individual and official capacity,
BETHANY LAFFERTY, in her individual and official capacity
CORINNE BARNETT, in her individual and official capacity,
JEAN MULDER, in her individual and official capacity,
AARON GLEE, in his individual and official capacity,
CARRIE WATSON, in her individual and official capacity, and

    Defendants

and

TAMARA NILES, in her individual and official capacity, and
SHAWN LEWIS, in his individual and official capacity.

    Defendants/ Counterclaim Plaintiffs.

---

**Regan Benson's Special Motion to Dismiss Amended Counterclaim**

---

Plaintiff Regan Benson ("Ms. Benson") by and through her attorneys, Stimson LaBranche Hubbard, LLC, moves pursuant to Colorado's anti-SLAPP law, C.R.S. § 13-20-1101, to dismiss

the sole remaining counterclaim brought by Defendants/Counterclaim Plaintiffs Tamara Niles and Shawn Lewis.

Niles and Lewis are public officials who hold high-ranking positions within the City of Englewood; Shawn Lewis is the City Manager and Tamara Niles is the City Attorney. They are decision-makers for the City, make policies that impact residents and the public, and advise the elected Council members at every City Council meeting from their desks just off the side of the Council's dais.

Regan Benson is openly and vocally critical of Niles and Lewis. She objects to many of the decisions they have made and policies they have written and implemented. She expresses her opinions in direct communications with Niles and Lewis, by making public comment at Council meetings, and through videos posted to her YouTube channel. She sometimes uses offensive language. She sometimes calls people names that may be hurtful. But she has a right to do so. The ability to criticize high-ranking government officials goes directly to the core of the First Amendment protections.

Lewis and Niles have been trying to silence Benson for years. They have reported her protected speech to law enforcement and had her arrested and prosecuted. They used administrative procedures to exclude her from City Council meeting. They implemented policies specifically designed to outlaw her protected activity.

The Counterclaims are yet another effort to dissuade Ms. Benson from holding the important government officials accountable for their abuse of office. The Counterclaims are precisely the kind of "Strategic Lawsuit Against Public Participation" (SLAPP) the Colorado legislature was targeting when the anti-SLAPP laws were enacted. The First Amended Counterclaim should be dismissed.

*Certificate of Conferral*: The parties have conferred on this motion and stipulated that the first part of the anti-SLAPP test is satisfied here. The parties disagree about whether the Niles and Lewis can show a reasonable likelihood of success on their counterclaim and therefore the Counterclaim Plaintiffs oppose this motion.

## FACTUAL BACKGROUND

Regan Benson is the Executive Director of Helping Hands for Dignity, a nonprofit which provides direct outreach to the unhoused population in the Denver Metro area and advocates for policy changes to support the homeless community. (Benson Decl. ¶ 1.) For the last few years, Benson's work has largely focused on the Englewood area. (*Id*. ¶ 2.) Benson regularly communicates directly with Englewood officials on issues related to her clients, general governance, and law enforcement accountability. (*Id*. ¶ 3.) She advocates for the public and holds government accountable through records requests, by seeking bodyworn camera footage, and by recording the activities of government officials and posting them to her YouTube Page. (*Id*. ¶ 4.)

Benson regularly attends Englewood City Council meetings and participates in public comment. Her statements during public comment often push elected officials to do more or do better for their citizens. (*Id*. ¶ 5.) City Council meetings are held in the Englewood Municipal Building and are open to the public. (*Id*. ¶¶ 6-7.) At City Council meetings, the seven council members sit on a dais at the front of the room, a uniformed police officer sits at the rear of the room (with others just outside council chambers), and members of the public sit on benches in the middle. (*Id*. ¶ 7.) City Manager Lewis and City Attorney Benson sit at desks just to left of the dais in full view of the elected officials, police officers, and members of the public. (*Id*. ¶ 8.)

Englewood also livestreams these meetings on its public YouTube channel. (*Id*. ¶ 9.) The view on the livestream pans from a wide-angle which shows most of the room, including Niles and Lewis's desks to close up views of whoever in the room is speaking at any given moment. (*Id*. ¶¶ 9-10.)

3

The Amended Counterclaim relates to Benson's statements during her public comment at the May 19, 2025 City Council meeting. Benson had filed this lawsuit the day prior and it was served on some of the defendants, including two elected council members and Niles and Lewis, just before the public meeting. (ECF Nos. 1, 7, 10-11, 13-14.) During Benson's public comment, she made the following statement:

> People aren't going to like this million dollar lawsuit dumb shits. They're not. I don't care how many fricking apartments you built. And you're still not listening to me. Crystal's still out here. Nowhere to go. You got ole Shawn and Tamara over here just you know playing fricking cornholie with each other while Crystal's out here being chased by the cops. Giggle giggle Shawn, you idiot. You're an idiot. You're an indecent human being. You are an idiot. And now you're getting sued. You and that bimbo over there. You two are the dumbest people in this entire city coupled by these two morons and you just cheer each other on. Tamara, you couldn't even work for a fricking collection agency. You're a dip shit. You suck at being an attorney. Don't you get that? Quit. Jamie is going to mop your fricking floor. She is going to make you cry. Repeatedly.

(Benson Decl. ¶¶ 17-18; Ex. 1, Transcript of Benson Public Comment at May 19, 2025 City Council Meeting.[1]) During Benson's public comment on May 19, 2025, the seven elected members of the Englewood city council were present, along with uniformed police officers, other Englewood personnel, and approximately 10-15 members of the public. (*Id.* ¶ 20.)

Counterclaim Plaintiffs Niles and Lewis now assert that Ms. Benson's comment about them "playing fricking cornholie" was defamatory because—in their mind—it accused them of

---

[1] Plaintiff/Counterclaim Defendant attaches unofficial partial transcripts of the recordings referenced herein to assist the Court in its review of the matter. Additionally, the videos from which these transcripts are made are publicly available through YouTube and hyperlinks are provided where appropriate.

sexual misconduct.[2] (ECF No. 58.) For the reasons set forth below, the Amended Counterclaim fails as a matter of law and should be dismissed.

## LEGAL STANDARD

Colorado's anti-SLAPP statute declares "it is in the public interest to encourage continued participation in matters of public significance and that this participation should not be chilled through abuse of the judicial process." C.R.S. §13-20-1101(1)(a). The Colorado legislature enacted the anti-SLAPP statute to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." C.R.S. §13-20-1101(1)(b).

Section 13-20-1101(3)(a) of the Colorado anti-SLAPP statute authorizes a "special motion to dismiss" a "cause of action against a person arising from any act of that person in furtherance of their right of petition or free speech under the United States constitution or the state constitution in connection with a public issue." C.R.S. § 13-20-1101(3)(a). This Court has repeatedly held that Colorado's anti-SLAPP law applies to state-law tort claims brought in federal court. *See, e.g., Moreau v. U.S. Olympic & Paralympic Cmte.*, 641 F. Supp. 3d 1122 (D. Colo. 2022).

When considering an anti-SLAPP motion, courts employ a two-step test. First, "the court determines whether the defendant has made a threshold showing that the conduct underlying the plaintiff's claim falls within the scope of the anti-SLAPP statute – that is, that the claim arises from an act "in furtherance of the [defendant's] right of petition or free speech…in connection

---

[2] While the Amended Counterclaim references other course language used by Ms. Benson during her public comment at the May 19, 2025 meeting, Counterclaim Plaintiffs have confirmed that these other statements are provided for context only and that the only allegedly defamatory statement relates to cornhole (or "cornholing" as Niles and Lewis assert).

5

with a public issue." C.R.S. §13-20-1101(3)(a). The parties have stipulated that the first step of the anti-SLAPP analysis is satisfied in that Ms. Benson's conduct at issue in the Counterclaim is sufficiently connected to a public issue.

At step two, the Court must assess whether Lewis and Niles, as Counterclaim Plaintiffs, can establish a "reasonable likelihood" of prevailing on their counterclaim. *Stevens v. Mulay*, No. 19-cv-1675-REB-KLM, 2021 WL 1153059, at *3 (D. Colo. March 26, 2021). A claim should be dismissed unless the claimant presents sufficient evidence to satisfy the Court that they are reasonably likely to prevail on their counterclaim. *Coomer v. Make Your Life Epic*, 659 F. Supp. 3d 1189, 1200 (D. Colo. 2023).

### THE ENGLEWOOD PARTIES CANNOT SHOW A REASONABLE LIKELIHOOD OF PREVAILING ON THEIR DEFAMATION CLAIM

"Defamation is a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage." *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994). Under Colorado law, in a defamation case involving public figures or matters of public concern, a claim must satisfy six elements: (1) a defamatory statement; (2) that was materially false; (3) concerning the plaintiff(s); (4) published to a third party; (5) with actual malice; and (6) that caused actual or special damages. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017). In this case, the Counterclaim Plaintiffs cannot show a reasonable likelihood of establishing that Benson made a defamatory statement.

Moreover, public officials and public figures—who often are the topic of expressive speech—are held to a higher standard than private plaintiffs when bringing defamation suits. *Sullivan*, 376 U.S. at 292. The Supreme Court has observed on several occasions that hurt feelings are an inevitable risk of public office and do not outweigh the compelling interest in free speech. As Justice Powell noted,

6

> An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case.... [T]hose classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.... [T]hey invite attention and comment.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344–45 (1974). It is inevitable that such comments will not always be "reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic and sometimes unpleasantly sharp attacks'." *Hustler Magazine v. Falwell,* 485 U.S. 46, 51, (1988) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964)).

Niles and Lewis claim Benson's "playing fricking cornholie" statement was defamatory because it "falsely accuses Defendants Niles and Lewis of engaging in sexual conduct with each other." (ECF No. 59 ¶ 14.) While an accusation of serious sexual misconduct can be defamatory, *Gordon v. Boyles*, 99 P.3d 75, 80 (Colo. App. 2004), Niles and Lewis's subjective understanding of Benson's statement is irrelevant. Under Colorado law, "the meaning of allegedly defamatory words is a matter of law left to the court—not a factual allegation to which it must defer," even at the motion to dismiss stage. *Fry v. Lee*, 2013 COA 100, ¶ 29. Rather, when determining whether a statement is defamatory as a matter of law, the Court must determine "how the publication would have been understood by a reasonable or average lay reader." *Fry*, 2013 COA 100, ¶ 34; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513, 515 (evaluating the publication by its impact on a "reasonable reader"); *Knapp v. Post Printing & Publ'g Co.*, 144 P.2d 981, 984 (Colo. 1943) ("[a] newspaper publication must be measured by its natural and probable effect upon the mind of the average lay reader").

7

**A.     The Plain and Ordinary Meaning of the Words Used Shows No Reasonable Person would have Understood Benson's Comment as Defamatory**

The first step in this analysis is to look at the plain and ordinary meaning of the words used and consider the context in which the statement was made. *Keohane v. Stewart*, 882 P.2d 1293, 1299 (Colo. 1994); *Coomer v. Donald J. Trump for President, Inc.*, 2024 COA 35, ¶ 90 ("[W]e must consider each defendant's statements in context to determine how a reasonable person would have understood them."). "To determine the plain and ordinary meanings of words in the context of defamation claims, Colorado courts commonly and properly rely on lay dictionary definitions." *Fry*, 2013 COA 100, ¶ 30.

Niles and Lewis claim that Benson was accusing them of sexual misconduct because apparently the term "cornholing", when used as a verb, can be a reference to anal sex. (ECF No. 59 ¶ 15.) But Benson did not use "cornholie" as a verb; she said Niles and Benson were "playing fricking cornholie", which makes the term "cornholie" the object of the verb "playing." When used as a noun, as it was in this case, "cornholie" is a "lawn game in which players toss beanbags toward a slanted platform with the aim of passing the beanbag through a hole in the center of the platform." https://www.merriam-webster.com/dictionary/cornhole (accessed Oct. 1, 2025). A reasonable listener would have understood Benson's statement that Niles and Lewis were "playing fricking cornholie" to be referencing the recreational lawn game rather than accusing them of sexual misconduct.

The Amended Counterclaim asserts that Benson "concedes her statement referred to sexual activity in two subsequent YouTube video that she published addressing Defendants' counterclaims." (ECF No. 59 ¶ 17.) First, this argument again confuses the relevant standard and advocates substituting Benson's subjective intent for the objective reasonable person standard. To do so would be error. But more than this, the videos cited by Niles and Lewis do not show

Benson making a concession about the meaning or intent of her statements. Rather, the videos depict Benson discussing the allegations in the original Counterclaim and making fun of Niles and Lewis's assertion that she accused them of sexual misconduct. (Benson Decl. ¶ 21; Ex. 2, Partial Transcript of July 25, 2025 video; Ex. 3, Partial Transcript of August 5, 2025 video.) In sum, the plain and ordinary meaning of Benson's comment shows that no reasonable listener would have understood the statement as defamatory.

**B.    No Reasonable Listener Would Have Understood Benson's Statement to be an Assertion of Fact**

Even if a reasonable listener could have interpreted Benson's "playing fricking cornholie" comment to be a reference to sexual activity, her statement was the kind of figurative speech or hyperbole that is not actionable. When determining whether a statement is defamatory, the Court must remain cognizant of First Amendment concerns because, as the Supreme Court stated in *New York Times Co. v. Sullivan*, "[w]hatever is added to the field of libel is taken from the field of free debate." 376 U.S. 254, 272 (1964) (internal quotations omitted). In line with this principle, courts have imposed constitutional limits on the types of speech that can be considered defamatory. Rhetorical hyperbole, imaginative expressions, and parody cannot sustain a defamation claim because "no reasonable person would take these types of speech as true" and these types of speech cannot reasonably be interpreted as stating actual facts about an individual. *Mink v. Knox*, 613 F.3d 995, 1005 (10th Cir. 2010).

To sustain a defamation claim, the defamatory statement must be one a reasonable person would conclude was an assertion of fact. *Keohane*, 882 P.2d at 1299. To determine whether a statement is actionable or whether it constitutes protected hyperbole, courts look at: "(1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances

9

surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed." *Id*.

In *Keohane*, a district court sued a variety of defendants for defamation after they published statements criticizing his rulings in a recent criminal case, following which he was not retained as a judicial officer. 882 P.2d at 1295-97. One of the defendants was a private citizen who wrote two letters to the editor that were published in the local newspaper. The Colorado Supreme Court looked at the entirety of the letter and concluded that it contained a number of statements of verifiable fact about the plaintiff that were capable of being proved true or false. However, it found the letter was protected speech because "these statements, when viewed in the context of the letter as a whole, cannot reasonably be interpreted as stating actual facts about Judge Keohane." *Id*. at 1300. Amongst the reasons for this conclusion, the Court noted the use of all caps in the letter and the "colorful and exaggerated terms" used by the writer to express her views. The Court noted that this kind of "imaginative expression" and "rhetorical hyperbole" has been regarded by the Supreme Court "as particularly worthy of constitutional protection." *Id*. "The overall tone of the letter indicates that Campbell is venting her anger and frustration and is a signal that her words should not be taken literally or as reasoned accusations." *Id*.

Similarly, in *Arrington v. Palmer*, a political candidate sued the publisher of a postcard that was mailed to voters which contained negative statements about him, including the allegation that he "bullied and physically threatened those who disagreed with him." 971 P.2d 669, 670-71 (Colo. App. 1998). The court held that the statement about threatening others imputed commission of a criminal offense but affirmed dismissal of the defamation claim because the speech was nonetheless constitutionally protected. The *Arrington* court noted that the postcard was "replete with 'imaginative expression' and 'rhetorical hyperbole'" and used

10

"colorful, exaggerated terms," which suggested the accusations should not be taken literally. *Id*. at 673. Important to the *Arrington* court was the fact that the statements were made in the political arena and that "statements made in the midst of political debate must be considered within the usual and ordinary climate in which political candidates operate, which is 'often composed of equal parts of bombast, hyperbole, and billingsgate.'" *Id*. (quoting *Desert Sun Publishing Co. v. Superior Court*, 97 Cal. App. 3d 49, 53 (1979)). The court ultimately concluded that the statements were "the type of critical commentary typically filled with political innuendo and should not be taken at face value or viewed as a statement of fact." *Id*.

Like that letter to the editor in *Keohane*, Benson's "playing fricking cornholie" comment was made in the middle of her public comment to City Council which essentially amounted to a rant. Benson used colorful language and idioms such as "mop your freakin' floor" and "scatter like cockroaches." Benson's tone was similar to the ALL CAPS, exclamation point-ridden screeds in *Keohane*; she was yelling at times, laughing at times, and calling people names like "idiot", "bitch", and "dumb shit." Like the postcard in *Arrington*, Benson's comment was made in a "traditional forum for debate"—during public comment period at a City Council meeting—and was directed to elected officials and high-level government employees. *Arrington*, 971 P.2d at 673. The overall tone of Benson's comments showed she was venting her anger and frustration about Niles and Lewis's ineptitude rather than expressing a statement of fact that a reasonable person would have taken literally. *Keohane*, 882 P.2d at 1300; *Arrington*, 971 P.2d at 673.

Also notable is the fact that Benson's "playing fricking cornholie" comment was made in the midst of complaining about how Englewood government officials were not helping "Crystal." Crystal is a long-time Englewood resident whose home was condemned by Englewood due to alleged code violations. (Benson Decl. ¶ 11.) Crystal was left homeless, living

11

in a tent, and spoke at the May 5 City Council meeting about how Englewood police officers were chasing her from park to park. (*Id.* ¶ 12.) Benson had been helping Crystal for months and previously addressed Crystal's situation in her public comment during Council meetings, including on May 5, 2025. (*Id.* ¶¶ 11, 13.) When Benson noticed Lewis and Niles were not attentive during her public comment at the May 19 meeting, she made the statement that they were "playing fricking cornholie while Crystal's out here being chased by the cops." A reasonable listener would have understood Benson was venting her frustration about Niles and Lewis's inaction regarding Crystal rather than suggesting they were having anal sex with each other. *Keohane*, 882 P.2d at 1301 (venting about a matter of public concern "is a signal that her words should not be taken literally or as reasoned accusations."); *Arrington*, 971 P.2d at 673.

Moreover, the physical context in which Benson's statement was made shows no reasonable person would have taken Benson's "playing fricking cornholie" comment as a statement of fact. Benson made the comment during a public meeting in a room where more than twenty people were present, including at least ten members of the public, two Englewood police officers, seven members of City Council, and various Englewood support staff. (Benson Decl. ¶ 20.) The meeting was being livestreamed on Englewood's public YouTube channel, which frequently showed a view that included Lewis and Niles at their desks or zoomed to the camera on Lewis's desk. (*Id.* ¶ 16.); *see also* https://www.youtube.com/watch?v=tIGTST-1C1c @ 1:06:32 (wide view showing Niles and Lewis's desks); 1:53:39, 2:14:20, and 3:04:40 (close ups of Lewis); 2:02:24 & 2:29:20 (close ups on Niles). When Benson's "playing fricking cornholie" comment was made, Niles and Lewis were sitting at their desks just to the left of the Council dais in clear view of the rest of the room. (Benson Decl. ¶ 20.)

No reasonable person would interpret Benson's "playing fricking cornholie" comment as suggesting that Niles and Lewis were actively engaged in anal sex in the middle of this public meeting in front of elected officials, uniformed police officers, members of the public, and on a public livestream on YouTube. Rather, a reasonable listener would have understood Benson to have been using the kind of figurative language or rhetorical hyperbole that falls within the protection of the First Amendment. *See Mink v. Knox*, 613 F.3d 995, 1006 (10th Cir. 2010) (finding no defamatory statement where the statement could not be "reasonably understood as describing actual facts about the plaintiff or actual events in which he participated."); *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (rejecting defamation claim because "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.").

## **Conclusion**

Whether a statement is defamatory is a question of law. Particularly because of the important First Amendment considerations implicated by a defamation claim—which are exaggerated here because the Counterclaim Plaintiffs are high-ranking government officials—courts routinely resolve defamation claims through a motion to dismiss. Indeed, early resolution of these kinds of actions is exactly why the Colorado legislature enacted the anti-SLAPP law.

Niles and Lewis cannot show they are likely to prevail on their defamation claim because no reasonable listener would have interpreted Ms. Benson's "playing fricking cornholie" comment as a reference to a sexual act. And even if they could have understood it as such, Ms. Benson made this comment during a public meeting in the middle of a rant that used colorful

language and with the kind of rhetorical flair that a reasonable person would have understood suggests the speaker was not asserting a statement of fact.

For these reasons, Ms. Benson respectfully requests that the Court enter an Order granting this Motion and dismissing the First Amended Counterclaim with prejudice; and award Ms. Benson her attorney fees and costs as provided in Colorado's Anti-SLAPP statute, C.R.S. § 13-20-1101(4)(a).[3]

Dated: October 7, 2025.

                    Respectfully submitted,

*s/ Jamie Hubbard*
Jamie Hubbard
Carey Bell
STIMSON LABRANCHE HUBBARD, LLC
1652 Downing Street
Denver, CO 80218
Phone/Fax:     720.689.8909
Email:   hubbard@slhlegal.com
bell@slhlegal.com

*Attorneys for Plaintiff Regan Benson*

---

[3] Ms. Benson also intends to seek fees associated with the time spent filing the Special Motion to Dismiss the original Counterclaims. To ensure the purpose of the anti-SLAPP laws is fully effectuated, courts have routinely held that a plaintiff's dismissal of claims after the filing of a special motion to dismiss gives rise to a presumption that the defendant is the "prevailing defendant" for purposes of the fee-shifting provision in anti-SLAPP laws. *See, e.g., Ross v. Seyfarth Shaw*, 96 Cal.App.5th 722 (2023); *Satz v. Starr*, 338 A.3d 925 (N.J. App. 2025). Ms. Benson intends to file such motion after the instant motion is resolved by the Court because part of the fee analysis is the impact of the dismissal on the overall facts and damages and to preserve judicial resources by avoiding multiple determinations on the reasonableness of the fees requested.

**Certificate of Service**

I certify that on October 7, 2025, I electronically filed the foregoing *Regan Benson's Special Motion to Dismiss Amended Counterclaim* with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Nancy Hickam*
Nancy Hickam, Paralegal

15