IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01571-RMR-KAS

REGAN BENSON,

      Plaintiff/Counter Defendant,

v.

TAMARA NILES, in her individual and official capacity, and
SHAWN LEWIS, in his individual and official capacity,

      Defendants/Counter Claimants

and

ENGLEWOOD, COLORADO, a Colorado municipal corporation,
OTHONIEL SIERRA, in his individual and official capacity,
JOE ANDERSON, in his individual and official capacity,
SERGIO RENTERIA, in his individual and official capacity,
BETHANY LAFFERTY, in her individual and official capacity,
CORINNE BARNETT, in her individual and official capacity,
JEAN MULDER, in her individual and official capacity,
AARON GLEE, in his individual and official capacity, and
CARRIE WATSON, in her individual and official capacity.

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      In this civil rights action, Plaintiff Regan Benson sues the City of Englewood (the

"City") for First Amendment violations pursuant to 42 U.S.C. § 1983. She also names ten

City employees in their individual capacities: City Attorney Tamara Niles, City Manager

Shawn Lewis, Mayor Othoniel Sierra, Councilmember Joe Anderson, Assistant City

Attorney Sergio Renteria, Officer Jean Mulder, Detective Aaron Glee, and librarians

Bethany Lafferty, Corinne Barnett, and Carrie Watson (collectively, "the "Defendant employees").

This matter is before the Court on Defendants' **Motion to Dismiss First Amended Complaint** [#50] ("the Motion"). Plaintiff filed a Response [#63], in which she requested a hearing "[t]o the extent any argument made herein is unclear, or if the Court has any questions or concerns about the parties' positions[.]" *Response* [#63] at 2. Defendants filed a Reply [#75]. The Motion [#50] has been referred to the undersigned for a Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.C.COLO.LCivR 72.1(c)(3). *See Order Referring Motion* [#51]. The Court has reviewed the briefs, the entire case file, and the applicable law. The Court is satisfied that no hearing is necessary.

For the reasons stated below, the Court **RECOMMENDS** that Defendants' Motion [#50] be **GRANTED in part and DENIED in part**.

## I.    Background

Plaintiff initiated this action on May 18, 2025, *Compl.* [#1], and filed the operative First Amended Complaint [#36] on August 15, 2025. Plaintiff describes herself as an "outspoken advocate for the homeless in Englewood." *Am. Compl.* [#36] at 2. Her advocacy includes observing and speaking at public meetings, filing public records requests, filing complaints against the Englewood Police Department, and filming interactions with public officials and publishing them to her YouTube channel. *Id.* at 2, 5. Plaintiff claims that she is "well known" to Defendants, *id.*, and Defendants do not deny that they are aware of Plaintiff and her activities. *See generally Motion* [#50]; *Am. Countercls.* [#59].

Regarding the first incident underlying this lawsuit, Plaintiff alleges that, on March 4, 2024, she entered the City's public library to use the restroom. *Am. Compl.* [#36] at 9. Plaintiff asked a library security guard for the restroom key, and he asked her to sign her name in exchange for the key. *Id.* Plaintiff grabbed the key without signing for it, used the restroom, walked back to the guard's desk to return the key, and recorded her resulting interaction with him for about 10 minutes. *Id.* at 9-10. Plaintiff alleges that two days later, she had a confrontation with librarian Lafferty on a sidewalk outside the library, which she also filmed. *Id.* at 10. Plaintiff alleges that Lafferty threw one of her materials into the garbage and told her to "stop talking with members of the public about issues involving access to the public restroom." *Id.*

Plaintiff alleges that Lafferty and Barnett found the videos of each interaction on Plaintiff's YouTube channel and contacted Assistant City Attorney Renteria, to "talk about what they could do to put a stop to [Plaintiff's] expressive conduct[.]" *Id.* at 11. Plaintiff alleges that Renteria and City Attorney Niles agreed to initiate an investigation with the police department and to urge the security guard to file a report. *Id.* Officer Mulder and Detective Glee conducted an investigation resulting in criminal charges and Plaintiff's exclusion from the library. Specifically, Plaintiff alleges that (1) she was charged with two counts of misdemeanor harassment pursuant to Colo. Rev. Stat. § 18-9-111(1)(c); and (2) Library Supervisor Watson issued a 90-day exclusion order barring her from the library. *Id.* at 11-14. Plaintiff alleges that a prosecutor dismissed the criminal charges and a hearing officer sustained her appeal of the exclusion order. *Id.* at 14-15.

The second incident underlying this lawsuit occurred on October 7, 2024. *Id.* at 15. Plaintiff alleges that she signed up to make a three-minute public comment to the City

Council. *Id.* at 17. According to City policy, speakers making public comment must identify themselves and provide their address, cross-street, or city of residence ("the address rule"). *Id.* at 16. At the beginning of her remarks, Plaintiff introduced herself but did not provide any geographical information. *Id.* at 17. According to Plaintiff, Mayor Sierra interrupted her and asked her to provide her city of residence. *Id.* After she again refused, Mayor Sierra called a break, prompting the "majority" of Council members to leave the room. *Id.* at 18. Plaintiff continued her remarks. *Id.* After approximately four minutes, the Council members returned, and Mayor Sierra told Plaintiff that "her time was up" and "asked her to leave." *Id.*

Plaintiff alleges that City Attorney Niles issued a 45-day exclusion order barring Plaintiff from the room where City Council meetings are held. *Id.* Plaintiff further alleges that Niles filed a witness statement with law enforcement regarding Plaintiff's conduct at the meeting. *Id.* at 19. Detective Glee sought Plaintiff's arrest, and she was charged with two counts of impeding a public official or employee in a public building pursuant to Colo. Rev. Stat. § 18-9-110. *Id.* A prosecutor later dismissed the criminal charges, but a hearing officer upheld the exclusion order. *Id.* at 19-20. Plaintiff requested a police escort to attend two public events during the exclusion period, as the exclusion order instructed, but she was denied permission on both occasions. *Id.* at 20. After the order's expiration, Plaintiff signed up to make a public comment at a January 6, 2025 City Council meeting. *Id.* Plaintiff alleges that Mayor Sierra ended the public comment period without allowing her to speak. *Id.* at 20-21.

Also in October 2024, City Manager Lewis enacted an Administrative Order prohibiting anyone from recording videos in City buildings without the consent of all

people being recorded. *Id.* at 21. (The policy does not apply to law enforcement officers, security cameras, or rooms in which meetings subject to Colorado's Open Meetings Law are held.) *Id.*

In her First Amended Complaint [#36], Plaintiff asserts eleven causes of action:

- Claims 1-5: First Amendment retaliation concerning the library exclusion order, the first arrest and prosecution, the second arrest and prosecution, the City Council exclusion order, and the denial of public comment, *id.* at 24-29;

- Claim 6: conspiracy to violate the First Amendment, *id.* at 30;

- Claim 7: violation of Plaintiff's rights under the Colorado Constitution and Colo. Rev. Stat. § 13-21-131; *id.* at 31-32;

- Claims 8-10: First Amendment violations concerning the library exclusion order, the City Council exclusion order, and the denial of public comment, *id.* at 32-35; and

- Claim 11: First Amendment overbreadth concerning the Administrative Order, *id.* at 36.

In the present Motion [#50], Defendants seek dismissal of all claims.

## II.    Legal Standards

### A.    Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a claim where the plaintiff has "fail[ed] to state a claim upon which relief can be granted." The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir.

1994). "A complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When the complaint includes 'well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Carraway v. State Farm & Cas. Co.*, No. 22-1370, 2023 WL 5374393, at *4 (10th Cir. Aug. 22, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). "[D]ismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104-05 (10th Cir. 2017). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial[.]" *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

Further, "[b]ecause § 1983 . . . [is a] vehicle[] for imposing personal liability on government officials, [the Tenth Circuit] ha[s] stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). Therefore, when bringing a § 1983 claim, a plaintiff must "'make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations[.]'" *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (quoting *Robbins v. Okla. ex rel. Dep't of Hum. Servs.*, 519 F.3d 1242, 1250

(10th Cir. 2008)). "When various officials have taken different actions with respect to a plaintiff, the plaintiff's facile passive-voice showing that [her] rights 'were violated' will not suffice." *Pahls*, 718 F.3d at 1225-26. "Likewise insufficient is a plaintiff's more active-voice yet undifferentiated contention that 'defendants' infringed [her] rights." *Id.* at 1226. Instead, the plaintiff must "identify specific actions taken by particular defendants" in order to state a § 1983 claim. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).

**B.    Qualified Immunity**

A qualified immunity defense "protects government officials from civil liability so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)). To determine whether qualified immunity applies, the Court considers (1) whether the officials' "alleged conduct violated a constitutional right," and, if so, (2) whether "it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023) (citation and internal quotation marks omitted). If the plaintiff fails to demonstrate either requirement, the court must grant the defendant qualified immunity and need not undertake additional analysis. *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001).

### III.    Analysis

Section 1983 imposes liability on

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]

42 U.S.C. § 1983.

Plaintiff sues the City and the various Defendant employees in their official capacities and individual capacities based upon their involvement in (1) the library exclusion order, (2) the first arrest and prosecution, (3) the second arrest and prosecution, (4) the City Council exclusion order, and (5) the prohibition from making public comment. *Am. Compl.* [#36] at 24-36. Defendants argue that Plaintiff has failed to state claims upon which relief can be granted. *Motion* [#50]. The City further asserts that Plaintiff has not sufficiently pleaded *Monell* liability, and the Defendant employees invoke qualified immunity on all claims except the state law claim. *Id.* The City further argues that the claims against the individual Defendants in their official capacities should be dismissed because they are duplicative of the claims against the City. *Id.* at 2.

The Court will first address whether Plaintiff has stated claims upon which relief can be granted pursuant to Rule 12(b)(6). If Plaintiff has done so, the Court will then address *Monell* liability and qualified immunity as to those claims.

## A. First Amendment Retaliation (Claims 1-5)

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a claim for First Amendment retaliation, Plaintiff must allege that:

1. she was engaged in constitutionally protected activity;

2. Defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and

8

3.  Defendants' adverse action was substantially motivated as a response to her exercise of constitutionally protected conduct.

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1227 (10th Cir. 2020) (quotation and brackets omitted). Further, in cases involving an alleged retaliatory arrest or prosecution, plaintiffs must "plead and prove the absence of probable cause for the underlying criminal charge. *Nieves v. Bartlett*, 587 U.S. 391, 400 (2019).

### 1.    Library Exclusion Order (Claim 1)

Plaintiff asserts Claim 1 against the City and Defendants Watson, Barnett, Lafferty, Mulder, Niles, and Renteria. *Am. Compl.* [#36] at 24.

### a.    Additional Background

Plaintiff alleges that she has frequently vocalized her opposition to post-pandemic restrictions placed on the public's access to restrooms in the public library and, in connection with her advocacy, she sometimes records her interactions with City personnel. *Id.* ¶¶ 32-35. Plaintiff's frustrations with the restroom policy continued to mount from January through February 2024 and reached a "tipping point" on March 4, 2024, when a security guard told Plaintiff that she needed to write her name on a sheet of paper to receive a restroom key. *Id.* ¶¶ 37-40, 44-46. Plaintiff ignored the request, took the key, entered the restroom, and upon return, recorded her interaction with the security guard.

Plaintiff's first and second claims turn on the particulars of this interaction:

> As she was leaving the restroom, [Plaintiff] began recording on her cell phone to document [the security guard's] response when she returned the restroom key. [Plaintiff] continued recording her interaction with [the security guard] for the next ten minutes as he spoke with [Defendant] Barnett, one of the librarians on duty, and then as he left the library and moved through public areas on the Civic Center property. The recording ended when [the security guard] entered an employee-only area of the Civic Center Building.

*Id.* ¶ 47. Plaintiff alleges that Defendants Watson, Barnett, Lafferty, Mulder, Niles, and Renteria retaliated against her for her expressive activities "by orchestrating her exclusion from the library." *Id.* ¶ 126. With respect to each of these Defendants, she alleges as follows:

- After a conversation with librarians **Lafferty** and **Barnett** about how to "put a stop" to Plaintiff's expressive conduct, Assistant City Attorney **Renteria** and City Attorney **Niles** asked Englewood Police to investigate and file charges against Plaintiff even though "they each knew that [Plaintiff] had committed no crime." *Id.* ¶¶ 53-54.

- "Attorney **Renteria** assured Officer **Mulder** that she had the backing of [Defendant] **Niles** and the City Attorney's Office in punishing [Plaintiff] for her expressive conduct." *Id.* ¶ 54.

- Officer **Mulder** spoke with librarians **Lafferty** and **Barnett** "[o]n the pretext of investigating an alleged offense," and **Lafferty** and **Barnett** "expressed their disapproval of [Plaintiff's] advocacy efforts and views on homelessness," with Lafferty calling Plaintiff "'a known menace' because she advocates for the homeless at Civic Center." *Id.* ¶ 55.

- Officer **Mulder** told **Lafferty** and **Barnett** to "issue [Plaintiff] an exclusion order based on an alleged violation of Englewood's Standards of Behavior" and assured them "that she had spoken with the City Attorney's office and had the City Attorney's blessing to punish [Plaintiff] for her speech." *Id.* ¶ 56.

- Officer **Mulder**, **Lafferty**, and **Barnett** agreed to exclude Plaintiff from the library based on Plaintiff's free speech activities. *Id.*

- **Lafferty** and **Barnett** "worked together with their supervisor," Defendant **Watson**, to "issue or cause to be issued" the exclusion order. *Id.* ¶ 62.

- Defendant **Watson** issued the order excluding Plaintiff from entering the library for 90 days. *Id.* ¶ 63.

The order provided that Plaintiff was excluded from the library based on her violations of the City's Code of Conduct — including threats, intimidation, harassment, and commission of a crime (Colo. Rev. Stat. § 18-9-111(1)(c)). *Id.* ¶¶ 63-64. A hearing

officer "found that [the City] had not shown that [Plaintiff] violated any [City] policy or Standard of Behavior when she recorded [the security guard] in the Civic Center Building," and sustained the appeal of the exclusion order. *Id.* ¶ 71.

In their Motion [#50], Defendants argue that Plaintiff fails to state a claim as to the library exclusion order for four reasons: (1) the library security guard "was not performing any government function when he was harassed by Plaintiff"[1]; (2) "[h]arassment is not a constitutionally protected activity"; (3) "[e]ven if [the library security guard] is considered a government actor, Plaintiff's physical obstruction of his ability to remain at his post and perform his duties by chasing him away is not protected speech"; and (4) Plaintiff fails to allege that "Defendants intended to prevent [her] from entering the library due to her views on the homeless community rather than to protect the safety of [the library security guard.]" *Motion* [#50] at 11-12. Defendant Watson also challenges her personal participation in the library exclusion order. *Id.* at 7-8.

### b.    Constitutionally Protected Activity

The Court first considers whether Plaintiff engaged in constitutionally protected activity. As an initial matter, the Court notes that Plaintiff alleges that she engaged in various forms of protected speech before the incident in question: she spoke with public officials concerning the library's restroom policy, talked to members of the public about the library's public restroom, filed public records requests, and distributed pocket constitutions outside the library. *Id.* ¶¶ 20-24, 33-35, 38-40, 49. Plaintiff alleges that those forms of protected speech, in addition to the incident in question, contributed to Defendants' general retaliatory motive. *Id.* ¶ 124.

---

[1] The security guard is not named as a defendant in this case.

As to the incident giving rise to her exclusion from the library, Plaintiff alleges that she (1) filmed a security guard, while (2) using offensively coarse language, and while (3) following him around the Englewood Civic Center building for ten minutes. *Am. Compl.* [#36] ¶¶ 47, 60. Defendants characterize Plaintiff's conduct as "chasing" the security guard and "physical[ly] obstruct[ing]" his ability to remain at his post. *Motion* [#50] at 12. The well-pleaded facts in the Amended Complaint [#36] do not support Defendants' characterizations, so the Court will not consider them.

In *Irizarry v. Yehia*, 38 F.4th 1282, 1289, 1292 (10th Cir. 2022), the Tenth Circuit noted that "videorecording is unambiguously speech-creation, not mere conduct" and concluded that "there is a First Amendment right to film the police performing their duties in public." *See also W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196-97 (10th Cir. 2017) (holding that "collection of resource data," including taking photographs, "constitutes the protected creation of speech"). Additionally, because the First Amendment protects the right to criticize police, it also protects the right to "remain in the area to be able to criticize the observable police conduct." *Jordan v. Jenkins*, 73 F.4th 1162, 1169 (10th Cir. 2021). Of course, the right to criticize police has "important limits," including where the criticism interferes with an officer's official duties. *Id.* at 1170. For example, if an individual is "physically blocking" or criticizing the officer "so loud[ly] that [the] officer is prevented from executing his or her duties, then the officer may restrict the speech based on this physical act." *Id*.

Further, "merely arguing with [law enforcement] about the propriety of their conduct, including about whether they have legal authority [to engage in particular conduct] falls within [protected speech.]" *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir.

2007) (finding lack of probable cause to arrest the plaintiff for yelling and screaming at officers when they sought to conduct a warrantless search of her home). Even "offensively coarse" language directed at the security guard would still be protected speech. *See Sgaggio v. Young*, No. 20-cv-01977-PAB-NYW, 2022 WL 970008, at *7 (D. Colo. Mar. 31, 2022) (agreeing that hurled insults at law enforcement were protected speech). Indeed, even "provocative and challenging" speech "is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Houston v. Hill*, 482 U.S. 451, 461 (1987); *see also Curtis v. Sheldon*, No. 07-1127, 2008 WL 11399756, at *4 (D.N.M. Nov. 10, 2008) (noting that "[v]erbal protest directed toward a police officer, even if vulgar and abusive in nature, is protected speech as long as it does not rise to the level of fighting words.").

The Court finds that certain elements of Plaintiff's conduct, as alleged, were undoubtedly protected speech under the First Amendment. Those aspects include filming the security guard and using offensively coarse language to criticize his enforcement of the bathroom key policy. *See Irizarry*, 38 F.4th at 1289; *Jordan*, 73 F.4th at 1169; *Sgaggio*, 2022 WL 970008, at *7. Thus, the Court finds that Plaintiff has plausibly pleaded enough at this stage to establish that she was engaged in constitutionally protected activity.

However, "drawing the line between speech and conduct can be difficult." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018). Although the United States Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea," it has acknowledged that "conduct may be sufficiently imbued with

elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (internal quotation marks and citations omitted).

In *Counterman v. Colorado*, 600 U.S. 66 (2023), the United States Supreme Court reviewed a case in which the defendant was prosecuted for stalking pursuant to Colo. Rev. Stat. § 18-3-602(1)(c).[2] The *Counterman* Court held that, in stalking prosecutions concerning true threats, the First Amendment requires the defendant be at least reckless in his subjective understanding of the threatening nature of his speech. *Id.* at 75-76. Post-*Counterman*, the Colorado Supreme Court drew a bright line between prosecutions concerning the content of a defendant's communications and prosecutions concerning the defendant's conduct, including "approaching, following, surveilling, and contacting" the victim. *People v. Crawford*, 568 P.3d 426, 430 (Colo. 2025). To the extent that Plaintiff's exclusion from the library was premised on her *following* the security guard around the Civic Center building, that conduct may not receive First Amendment protection. *Crawford*, 568 P.3d at 430; *see also Keerikkattil v. Hrabowski*, No. CIV.A. WMN-13-2016, 2013 WL 5368744, at *7 n.4 (D. Md. Sept. 23, 2013) ("Plaintiff was subject to sanctions for alleged stalking and harassment-related conduct, which included allegedly following [the victim] to her home. As [the] [d]efendants note, this is not conduct that implicates rights under the First Amendment.").

However, the Court finds that the nature and character of Plaintiff's conduct, the extent to which she either followed the security guard or merely documented his official

---

[2] The harassment statute under which Plaintiff was charged, Colo. Rev. Stat. § 18-9-111(1)(c), is a lesser nonincluded offense of the stalking statute at issue in *Counterman*. *People v. Harmon*, 570 P.3d 499, 516 (Colo. App. 2025).

business, and the basis for her arrest, prosecution, and exclusion from the library, present fact-intensive issues requiring the development of an adequate factual record. Parsing those parts of Plaintiff's conduct that were and were not protected speech may be necessary after adequate development of a factual record. Thus, Plaintiff's Claim 1 should proceed to discovery.

Finally, Defendants argue that the security guard was "not an employee of the City" and "not performing any government function" during his interaction with the Plaintiff. *Motion* [#50] at 12. Because the security guard is not a named in this lawsuit, the applicability of Defendants' argument is not immediately apparent. Defendants may have intended to argue that Plaintiff's act of video-recording a private citizen is not "unambiguously speech-creation" in the same way that it is when citizens record police officers, as recognized in *Irrizarry*, 38 F.4th at 1289. In any event, Plaintiff alleges, "At all times during this interaction, [the security guard] was on duty as a security guard at the Englewood Civic Center Building, working on behalf of the City of Englewood, enforcing City of Englewood policies and practices." *Am. Compl.* [#36] ¶ 48. The Court finds that this allegation is sufficient at this stage to foreclose Defendants' arguments concerning the security guard's status, regardless of the purpose for which they made it.

### c.    Chilling Injury

Next, the Court considers whether Plaintiff's exclusion from the library for 90 days would chill a person of ordinary firmness from continuing to engage in the protected speech. Defendants concede this point. *See Motion* [#50] at 12.

d.    Causation

Finally, the Court considers whether the library exclusion order was substantially motivated as a response to Plaintiff's constitutionally protected activity. "[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, . . . retaliation is subject to recovery as the but-for cause of official action offending the Constitution." *Hartman*, 547 U.S. at 256.

Defendants argue that the Complaint contains "no allegations supporting Defendants intended to prevent Plaintiff from entering the library due to her views on the homeless community rather than to protect the [the security guard's safety]." *Motion* [#50] at 12. In response, Plaintiff contends that Defendant's argument "finds no support in the Amended Complaint." *Response* [#63] at 3-4. She points to allegations in the Complaint regarding Defendant Lafferty's negative comments about her advocacy work, which included distributing pocket constitutions while speaking of the City's purported constitutional violations. *See*, *e.g.*, *Am. Compl.* [#36] ¶¶ 49-50. Plaintiff also alleges that Defendant Lafferty "told [her] to stop talking with members of the public about issues involving access to the public restroom" and threw her pocket constitution in the garbage. *Id.* ¶ 50.

Plaintiff alleges that Defendants Lafferty's and Barnett's disdain for her advocacy work set a chain of events in motion involving various city officials. *Id.* ¶¶ 62-64. The librarians allegedly sought input from Defendant Renteria on how they could stop Plaintiff from "recording public officials, passing out constitutions, and providing information about her cause to people passing by." *Id.* ¶ 53. Defendant Renteria, after conversations with Defendant Niles, then allegedly asked Englewood Police to investigate and to file what

Plaintiff deems "baseless charges that punished [Plaintiff's] free speech[.]" *Id*. ¶ 54. Defendant Mulder then allegedly "collected information" from Defendants Lafferty and Barnett to support Plaintiff's "unlawful exclusion" from the library and to bring criminal charges against her "in retaliation for her expressive activities." *Id*. ¶ 55. And, upon completing the investigation, Defendant Mulder then allegedly told the librarians to issue "an exclusion order based on an alleged violation of Englewood's Standards of Behavior," knowing that the exclusion order's purpose "was to punish [Plaintiff] for her speech." *Id*. ¶ 56. Defendant Mulder told Defendants Lafferty and Barnett that they "had the City Attorney's blessing to punish [Plaintiff] for her speech." *Id.* Thus, at least as to Defendants Lafferty, Barnett, Niles, Renteria, and Mulder, Plaintiff has adequately alleged that retaliatory intent motivated her exclusion from the library.

Plaintiff also argues that a retaliatory motive is supported by the temporal proximity between her expressive conduct—complaining about the restroom policy (one to two months before the exclusion order) and distributing constitutions (one week before the exclusion order)—and the library exclusion order. *Response* [#63] at 4 (citing *Am. Compl*. [#36] ¶¶ 37-42, 63). Taking Plaintiff's well-pleaded allegations as true at this stage of the proceedings, the Court concludes that Plaintiff has plausibly alleged that her exclusion from the library was meant to silence and deter her from engaging in protected activities on behalf of the homeless in the future. Plaintiff alleges specific, nonconclusory facts showing that "but for the retaliatory motive," she would not have been excluded from the library. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). Additionally, the temporal proximity between the protected speech and the alleged retaliation allows the Court to draw a reasonable inference of a retaliatory motive. *Cf. Meiners v. Univ. of Kan.*,

359 F.3d 1222, 1231 (10th Cir. 2004) (noting that a six-week period between protected activity and an adverse action may be sufficient for a reasonable inference of retaliatory motive, but a three-month period, standing alone, is not).

Taking Plaintiff's allegations as true, viewing them in the light most favorable to her, and drawing all reasonable inferences in her favor, as the Court is required to do, persuades the Court that the Amended Complaint [#36] plausibly asserts the requisite casual connection between Plaintiff's protected speech and the library exclusion order.

### e.    Personal Participation of Defendant Watson

Having found that Plaintiff plausibly pleaded a prima facie case of First Amendment retaliation, the Court turns to whether Plaintiff has adequately pleaded Defendant Watson's personal participation.

Because § 1983 claims seek to impose personal liability on government officials, the Tenth Circuit "ha[s] stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants." *Pahls*, 718 F.3d at 1225. Therefore, when bringing a § 1983 claim, a plaintiff must "'make clear exactly *who* is alleged to have done *what* to *whom*,'" as opposed to merely relying on collective allegations. *Kan. Penn Gaming*, 656 F.3d at 1215 (quoting *Robbins*, 519 F.3d at 1250).

In the Amended Complaint [#36], Plaintiff alleges Defendant Watson's participation as follows:

- "[Defendants Lafferty and Barnett] worked together with their supervisor, [Defendant] **Watson**, to issue or cause to be issued a Notice of Ejection/Exclusion prohibiting [Plaintiff] from entering the Library and other parts of the Civic Center Building." *Am. Compl.* [#36] ¶ 62.

- "On March 11, 2024, Library Supervisor [Defendant] **Watson** issued a Notice of Ejection/Exclusion to [Plaintiff]." *Id.* ¶ 63.

Defendants argue that Defendant Watson's act of issuing the exclusion order was a mere "ministerial activity" that does not establish personal participation. To support their ministerial activity theory, Defendants cite three cases: (1) *Butterfield v. Garden*, No. 2:12-CV-1043-CW, 2014 WL 4803166, at *3 (D. Utah Sept. 26, 2014); (2) *Springer v. Seventh Judicial District Court*, 716 F. Supp. 3d 1139, 1159 (D.N.M. 2024); and (3) *Torres v. City of New York*, No. 20-cv-4007, 2022 WL 955152, at *7 (E.D.N.Y. Mar. 30, 2022).

In *Butterfield*, the court concluded that there was not an "affirmative link" between Plaintiff's legal theory (inadequate medical treatment) and a defendant who did not have "the authority or ability to prescribe medications." 2014 WL 4803166, at *3. The court concluded that the defendant's act of dispensing the medication prescribed by others was "ministerial only." *Id*. The *Springer* case does not squarely address the issue of personal participation. *See Springer*, 716 F. Supp. 3d at 1159-63 (concluding that the plaintiff failed to state claims for substantive or procedural due process violations as to the defendant in question). In *Torres*, the court concluded that preparing paperwork, preparing reports, and signing off on paperwork were "ministerial and routine actions" that do not constitute taking "an active role" in an alleged malicious prosecution. 2022 WL 955152, at *7 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

Plaintiff responds that the "ministerial activity exception" does not apply to Defendant Watson because (1) Defendant Watson, by nature of her position, had authority to exclude Plaintiff from the library, and (2) she directly participated in Plaintiff's exclusion by signing and serving the exclusion order. The Court agrees. Thus, this case is distinguishable from *Butterfield*, where the defendant had no authority over the decisions central to the inadequate medical treatment claim. To the extent that Defendant

Watson signed the exclusion order—which she asks the Court to view as "ministerial"—the signing of the order represents a discretionary decision central to Plaintiff's Claim 1 and is therefore distinguishable from the paperwork discussed in *Torres*.

However, the Court finds that Plaintiff has failed to allege any retaliatory intent as to Defendant Watson. Plaintiff alleges that Defendants Lafferty, Barnett, and Mulder crafted a plan to punish Plaintiff for her speech with the "blessing" of Defendants Niles and Renteria. *Am. Compl.* [#36] ¶ 56. However, notably absent from Plaintiff's Complaint is any allegation that Defendant Watson had knowledge of this plan and acted accordingly. Instead, Plaintiff only alleges that Defendants Lafferty and Barnett "worked together with" Defendant Watson to have the order issued. *Id.* ¶ 62. For this reason, Plaintiff failed to adequately allege Defendant Watson's personal participation in the retaliatory scheme that she asserts.

Accordingly, the Court **recommends** that Defendant's Motion [#50] be **granted** with respect to Defendant Watson and that Plaintiff's Claim 1 be **dismissed without prejudice** as to her.

### f.  Qualified Immunity

The Court next addresses whether Defendants Barnett, Lafferty, Mulder, Niles, and Renteria, in their individual capacities, are entitled to qualified immunity in connection with this claim. Having determined that Plaintiff has plausibly alleged a First Amendment retaliation claim, the Court addresses the second prong of the qualified immunity analysis: whether Plaintiff has "identif[ied] an on-point Supreme Court or published Tenth Circuit decision [or] alternatively, [whether] 'the clearly established weight of authority from other courts . . . ha[s] found the law to be as the plaintiff maintains.'" *Quinn v. Young*, 780 F.3d

998, 1005 (10th Cir. 2015) (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). While precedent need not be "directly on point," it "must have placed the statutory or constitutional question 'beyond debate,'" such that no reasonable person in the defendant's position would have concluded that the challenged action was constitutional. *Id.* "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (citation omitted).

In response to Defendants' overarching qualified immunity argument, Plaintiff points to six cases: (1) *McIntryre v. Ohio Elections Commission*, 514 U.S. 334 (1995); (2) *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022); (3) *Schneider v. New Jersey*, 308 U.S. 147 (1939); (4) *Verlo v. Martinez*, 820 F.3d 1113 (10th Cir. 2016); (5) *Mesa v. White*, 197 F.3d 1041 (10th Cir. 1999); (6) and *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000). *Response* [#63] at 11. Plaintiff contends that these cases "show a reasonable person in Defendants' position would have known that it was unlawful to bar Plaintiff from the library." *Id.* at 12.

In *McIntyre*, the Supreme Court concluded that passing out unsigned leaflets, in other words "anonymous pamphleteering," is protected speech under the First Amendment. 514 U.S. at 357. In *Irizarry*, as discussed in section III(A)(1)(b), the Tenth

Circuit concluded that a First Amendment right to film the police performing their duties in public was clearly established at the time of the defendants' alleged conduct. 38 F.4th at 1292, 1294-95. In *Schneider*, the Supreme Court concluded that ordinances prohibiting the distribution of handbills to passengers in vehicles or the placement of handbills on vehicles violated the First Amendment. 308 U.S. at 148. In *Verlo*, the Tenth Circuit concluded that an administrative order prohibiting "expressive activities" within a certain radius of the courthouse, including marching, picketing, protesting, and distributing literature or other materials, violated the First Amendment. 820 F.3d at 1123-24, 1147. In *Mesa*, the Tenth Circuit concluded that it is impermissible to exclude a citizen from speaking at a public meeting based upon the topic he wished to discuss and pointedly noted that "viewpoint discrimination is almost universally condemned and rarely passes constitutional scrutiny." 197 F.3d at 1047. Finally, in *Worrell*, the Tenth Circuit concluded that the district court erred by granting summary judgment where the Plaintiff established each of the three elements of his retaliation claim. 219 F.3d at 1214.

Notably, in *Worrell*, the court stated that in retaliation cases, "the defendant's intent is the key element" in assessing whether that defendant is entitled to qualified immunity. *Id.* at 1215. "'An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" *Id.* (quoting *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990)). "Moreover, '[t]he unlawful intent inherent in such a retaliatory action places it beyond the scope of [an official's] qualified immunity if the right retaliated against was clearly established.'" *Id.* at 1215-16 (quoting *DeLoach*, 922 F.2d at 620).

Here, Plaintiff has alleged that Defendants Lafferty, Barnett, Mulder, Niles, and Renteria hatched a plan to punish Plaintiff, not only for the incident in question, but also for her earlier acts of protected speech that Defendants Lafferty and Barnett found undesirable. The six cases that Plaintiff cites establish that the vast majority of her alleged conduct, from passing out constitutions to filming the security guard, is protected under the First Amendment. To the extent that Plaintiff's act of following the security guard was not protected speech, her exclusion from the library based on that reason alone may have been proper. *Id.* at 1215. But Plaintiff alleges a robust scheme of retaliatory motive concerning far more of her protected speech than the mere act of following the security guard, which the Court concludes places Defendants' conduct "beyond the scope of [an official's] qualified immunity." *Id.* at 1216. Therefore, at this stage of the proceedings, the Court finds that Defendants Barnett, Lafferty, Mulder, Niles, and Renteria are not entitled to qualified immunity on Plaintiff's Claim 1.

Accordingly, the Court **recommends** that Defendants' Motion [#50] be **denied** to the extent it seeks dismissal of Claim 1 against Defendants Barnett, Lafferty, Mulder, Niles, and Renteria in their individual capacities.

### 2.    First Arrest and Prosecution (Claim 2)

Plaintiff asserts Claim 2 against the City and Defendants Niles, Renteria, Barnett, Lafferty, Mulder, and Glee. *Am. Compl.* [#36] at 25.

### a.    Additional Background

With respect to her first arrest and prosecution, Plaintiff alleges:

- City Attorney **Niles** and Assistant City Attorney **Renteria** "agreed that, as part of the plan to punish [Plaintiff] for her speech even though she had committed no crime," **Renteria** would contact the library security

guard and encourage him to file a police report concerning Plaintiff's conduct. **Renteria** proceeded accordingly. *Am. Compl.* [#36] ¶ 57.

- The library security guard "has testified under oath" that before **Renteria's** outreach, the security guard had "no intention" of reporting his interaction with Plaintiff to law enforcement. *Id*.

- After being instructed to do so by **Renteria**, the security guard called the City's "non-emergency dispatch line and reported that [Plaintiff] had followed him around the Civic Center building while videorecording him." The security guard "said that he was calling at the request of the City Attorney's Office." *Id*. ¶ 58.

- "On the pretext of investigating an alleged offense, Officer **Mulder** collected information from [**Lafferty**] and [**Barnett**] to support . . . the issuance of criminal charges against [Plaintiff] in retaliation for her expressive activities." *Id*. ¶ 55.

- Detective Aaron **Glee** "swore out an affidavit stating there was probable cause to believe [Plaintiff] violated C.R.S. § 18-9-111(1)(c)," even though he "knew there was no probable cause" and "knew her activities were First Amendment-protected." *Id*. ¶ 59.

Plaintiff alleges that she was charged with two counts of misdemeanor harassment under Colo. Rev. Stat. § 18-9-111(1)(c) for, in her words, "following [the security guard] in a public place while recording him and using offensively coarse language during her interaction with him." *Id*. ¶ 60. Plaintiff alleges that "Englewood police normally would not charge someone with those offenses under similar circumstances," that "[n]o one else had ever been prosecuted for engaging in that kind of conduct," and that the charges were "merely a pretext for punishing [Plaintiff] for her First Amendment-protected activities." *Id*. ¶ 61. Finally, Plaintiff alleges that a prosecutor dismissed both charges after her attorney "filed a lengthy motion citing the binding case law showing how the First Amendment protects a citizen's right to record public officials performing their official duties." *Id*. ¶¶ 67-68.

To succeed on her retaliatory arrest and prosecution claim, Plaintiff must plead that she would not have been arrested and prosecuted "but for" her expressive activities. *Nieves v. Bartlett*, 587 U.S. 391, 416 (2019) (Gorsuch, J., concurring) (retaliatory arrest); *Hartman v. Moore*, 547 U.S. 250, 263 (2006) (retaliatory prosecution). In other words, in addition to pleading the standard elements of a retaliation claim, as she has done, *see* section III(A)(1), above, Plaintiff must plausibly allege the absence of probable cause for the charges brought against her. *Nieves*, 587 U.S. at 404 (retaliatory arrest); *see also Hartman*, 547 U.S. at 266 (retaliatory prosecution).

### b.    Existence of Probable Cause

"Probable cause exists if facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Mink v. Knox*, 613 F.3d 995, 1003 (10th Cir. 2010) (internal quotation marks and citations omitted). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). "It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id*. (internal quotation marks, brackets, and citations omitted). "[M]ore than a bare suspicion" will suffice; it "need not reach the fifty percent mark." *Puller v. Baca*, 781 F.3d 1190, 1200 (10th Cir. 2015); *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011) (quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)).

Plaintiff first argues that an officer's probable cause determination cannot be based on protected speech. *Response* [#63] at 5. *See Mink*, 613 F.3d at 1003-04 ("It goes without saying that a government official may not base her probable cause determination

25

on an 'unjustifiable standard,' such as speech protected by the First Amendment."
(quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985))). As discussed in section
III(A)(1)(b), the events leading up to Plaintiff's arrest may have involved an act not
protected by the First Amendment (following the security guard)—the particulars of which
must be developed in discovery. Thus, the Court assumes that this argument is
insufficient to foreclose Defendants' argument.

The Court finds that a reasonable officer could have believed that Plaintiff's
conduct fit the above-outlined definition of harassment. Colo. Rev. Stat. § 18-9-111(1)(c)
provides: "A person commits harassment if, with intent to harass, annoy, or alarm another
person, the person . . . [f]ollows a person in or about a public place." A reasonable officer
could have believed, based on Plaintiff's own admissions, that she followed the security
guard in or about a public place. A reasonable officer could also have believed that Plaintiff
did so with intent to harass, annoy, or alarm the security guard. By her own account, the
guard did not prevent Plaintiff from using the restroom. Thus, although the security guard
asked Plaintiff to sign in for the bathroom key, he let her use the restroom without doing
so. Nevertheless, Plaintiff returned to his station *after* using the restroom to initiate the
subject interaction. Recognizing that probable cause is a low bar, the Court concludes
that Plaintiff's conduct could give a reasonable officer more than a bare suspicion that
she violated the harassment statute under which she was charged.

### c.    Pretext

However, Plaintiff's argument does not stop at the absence of probable cause. In
her Response [#63], Plaintiff alternatively argues that "probable cause cannot defeat a
First Amendment retaliation claim when it is plausibly alleged that the prosecution was a

pretext and similarly situated people with different views wouldn't be charged or prosecuted." *Response* [#63] at 7. To support her argument, she cites *Nieves*.

In *Nieves*, the plaintiff had a confrontation with two law enforcement officers at "Arctic Man," a weeklong winter sports festival held in Alaska. 587 U.S. at 395-96. The officers arrested the plaintiff, and he was later charged with disorderly conduct and resisting arrest. *Id.* at 396. Prosecutors dismissed the criminal charges, and the plaintiff sued the officers under § 1983, arguing that they violated his First Amendment rights by arresting him in retaliation for his speech—namely, his refusal to speak with one of the officers earlier in the evening and his attempt to intervene when the officers spoke with others. *Id.* at 396-97.

The Supreme Court set out the familiar guidance for prevailing on retaliatory prosecution claim: "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* at 398 (quoting *Hartman*, 547 U.S. at 259). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Id.* at 399. "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*

The Court then considered whether the "absence of probable cause" standard, as required in cases of retaliatory prosecution, also applied in cases of retaliatory arrest. *Id.* at 401. The Court concluded that generally, it does. *Id.*

But, noting the prevalence of state statutes empowering police officers to make warrantless misdemeanor arrests for "even a very minor criminal offense", *id.* at 407 (quoting *Atwater v. Lago Vista*, 532 U.S. 318, 344-45 (2001)), the Court carved out an

exception to the general rule. "Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406. "In such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018)).

The Court cited the example of jaywalking as an "endemic" offense that "rarely results in arrest." *Id.* at 407. Thus, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking . . . it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.* "In such a case, because probable cause does little to prove or disprove the causal connection between animus and injury, applying [the 'absence of probable cause'] rule would come at the expense of [that rule's] logic." *Id.* Accordingly, the Court held that the absence of probable cause rule "should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

The Court required objective evidence because applying a purely subjective approach would "allow[ ] even doubtful retaliatory arrest suits to proceed based solely on allegations about an arresting officer's mental state," among other unintended consequences. *Id.* at 403; *see also Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring). Thus, while some objective evidence is ultimately required that a plaintiff

was arrested where others similarly situated were not, a "demand for virtually identical and identifiable comparators goes too far." *Gonzalez*, 602 U.S. at 663.

Importantly, the *Nieves* Court carefully delineated the differences between cases of retaliatory arrest and retaliatory prosecution. "Unlike retaliatory prosecution cases, retaliatory arrest cases do not implicate the presumption of prosecutorial regularity or necessarily involve multiple government actors." 587 U.S. at 402.

> Unlike most retaliation cases, in retaliatory prosecution cases the official with the malicious motive does not carry out the retaliatory action himself — the decision to bring charges is instead made by a prosecutor, who is generally immune from suit and whose decisions receive a presumption of regularity. . . . Thus, even when an officer's animus is clear, it does not necessarily show that the officer induced the action of a prosecutor who would not have pressed charges otherwise.

*Id.* at 400 (internal quotation marks and citation omitted); *see also Hartman*, 547 U.S. at 263 ("Some sort of allegation, then, is needed both to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action, and to address the presumption of prosecutorial regularity."). Accordingly, for courts to suspend the presumption of prosecutorial regularity such that a retaliatory prosecution claim may succeed, the plaintiff must allege "a retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward." *Hartman*, 547 U.S. at 265. Those two things, in concert, are "enough for a prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge." *Id.*

Thus, to the extent that the *Nieves* Court created an exception for pretextual arrests, the Court finds that it does not apply to retaliatory prosecution claims.

Applying the foregoing principles to this case, the Court finds that Plaintiff has pleaded enough for her retaliatory arrest theory to proceed under *Nieves*. Plaintiff alleges:

(1) "Englewood police normally would not charge someone with those offenses under similar circumstances;" (2) "No one else had ever been prosecuted for engaging in that kind of conduct in the Civic Center;" and (3) "The charges were merely a pretext for punishing [Plaintiff] for her First Amendment-protected activities." *Am. Compl.* [#36] ¶¶ 59, 61. Plaintiff alleges specific, nonconclusory facts to support her allegation that her arrest was a pretext for an underlying retaliatory motive. *See* section III(A)(1)(d), above.

The Court finds that these allegations are sufficient to state a claim for a pretextual arrest under *Nieves*. *See Frey v. Town of Jackson*, 41 F.4th 1223, 1234 (10th Cir. 2022) ("Of course, at the pleading stage, a [p]laintiff need not prove h[er] case, and [courts] accept any concrete factual allegation as true.") (internal quotation marks and citation omitted).

To the extent that Plaintiff asserts retaliatory prosecution or, at least, that the Defendants induced a retaliatory prosecution, *see Hartman*, 547 U.S. at 263-65, that theory is unavailing. While Plaintiff alleges that Defendant Glee swore out an affidavit in retaliation for Plaintiff's protected speech, she does not allege that he "induced the prosecutor to bring charges that would not have been initiated without his urging." *Id*. at 262. Moreover, as discussed in section III(A)(1)(b), above, the Court has found that a reasonable officer could have believed that Plaintiff's act of following the security guard in or about a public place met the state statute's definition of harassment. Therefore, Plaintiff has failed to allege a retaliatory motive on the part of an official urging prosecution *combined with* an absence of probable cause supporting the prosecutor's decision to initiate charges. *See generally Am. Compl.* [#36] at 25-26. Further, Plaintiff does not point

the Court to any exception to the "absence of probable cause" rule in retaliatory prosecution cases.

### d.    Qualified Immunity

Having established that Plaintiff has stated a claim for First Amendment retaliation as to the first arrest, the Court turns to whether Defendants Niles, Renteria, Barnett, Lafferty, Mulder, and Glee, in their individual capacities, are entitled to qualified immunity on Plaintiff's Claim 2.

The law was clearly established in March 2024 that "'the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves,* 587 U.S. at 398 (quoting *Hartman,* 547 U.S. at 256); *see also Worrell,* 219 F.3d at 1212 ("[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigations, and legal harassment constitutes an infringement of that freedom."); *Sodaro*, 753 F. Supp. 3d at 1239. Thus, for the same reasons as those discussed in section III(A)(1)(f), the Court finds that Defendants Niles, Renteria, Barnett, Lafferty, Mulder, and Glee are not entitled to qualified immunity on Plaintiff's Claim 2 to the extent it rests on a claim of retaliatory arrest.

Accordingly, the Court **recommends** that Defendants' Motion [#50] be **denied** to the extent it seeks dismissal of Claim 2 (retaliatory arrest) against Defendants Niles, Renteria, Barnett, Lafferty, Mulder, and Glee in their individual capacities. The Court further **recommends** that Defendants' Motion [#50] be **granted** to the extent it seeks dismissal of Claim 2 (retaliatory prosecution) against Defendants Niles, Renteria, Barnett,

Lafferty, Mulder, and Glee and the retaliatory prosecution portion of Claim 2 be **dismissed without prejudice**.

### 3.    Second Arrest and Prosecution (Claim 3)

Plaintiff asserts First Amendment retaliation against the City and Defendants Sierra, Anderson, Niles, and Glee with respect to her second prosecution.

### a.    Additional Background

Plaintiff alleges that Defendants Sierra, Anderson, Niles, and Glee retaliated against her because of her expressive activities (*e.g.*, recording city council meetings, passing out constitutions outside the public library, speaking at city council meetings, communicating with Englewood employees about matters of public concern) "by orchestrating her charging, arrest, and prosecution based on the false allegations that her conduct at [a] city council meeting violated the law." *Am. Compl.* [#36] ¶¶ 138, 140. Plaintiff explains that City policy requires speakers who wish to make a three-minute public comment to sign up, identify themselves, and provide their address, cross-street, or city of residence (the address rule). *Id.* ¶¶ 74, 76. She alleges that she "often refused to provide geographical information at the beginning of her public comment based on her belief that the requirement discriminates against the unhoused population and discourages them from addressing their public officials." *Id.* ¶ 80.

At the October 7, 2024 City Council meeting in question, she alleges:

- "When [Plaintiff's] name was called, she approached the podium and gave her name. Consistent with past practice, [Plaintiff] did not provide her address, cross streets or city of residence." *Id.* ¶ 84

- "Mayor **Sierra** interrupted [Plaintiff] to demand that she provide her city of residence. [Plaintiff] protested against the interruption, insisting that it was her time to speak. Mayor **Sierra** asked her to stop and again requested that she provide her address or city of residence. [Plaintiff]

responded, "Excuse me. This is my time and I'm going to make public comment and I'm going to do it for three minutes uninterrupted." *Id*. ¶ 86.

- City Council Member **Anderson** said that "[Plaintiff] was violating the rules and suggested the Council take a break." *Id*. ¶ 87.

- Mayor **Sierra** then announced that the Council would "take a break while the City Attorney and the Police Department figure out a way to control the situation." The majority of the Council members then left the room." *Id*. ¶ 88.

During the break, Plaintiff "continued to make her public comment." *Id*. ¶ 89. On the Council's return from break, Mayor **Sierra** told her time had expired and asked her to leave. *Id*. ¶ 90. Plaintiff allegedly left the podium, and about ten minutes later, she left the meeting of her own accord. *Id*. ¶ 92. Plaintiff recorded the incident on her iPhone and posted the video to her YouTube channel. *Id*. ¶ 93.

With respect to her second arrest, Plaintiff alleges:

- "City Attorney **Niles** . . . submitted a witness statement to law enforcement in which she inaccurately stated that [Plaintiff] had not been recognized by the Mayor before beginning her public comment and inaccurately represented that [Plaintiff] was not legally authorized to speak at the City Council meeting." *Id*. ¶ 95.

- **Niles** "knowingly submitted this false report because she disagreed with the content of [Plaintiff's] speech and she wanted to retaliate against [Plaintiff] for her speech." *Id*.

- Based on **Niles**'s witness statement, Defendant **Glee** "sought an arrest warrant for [Plaintiff] alleging that she had violated [Colo. Rev. Stat.] § 18-9-110. [Plaintiff] was criminally charged . . . with two counts of violating [that statute]." *Id*. ¶ 96.

- "Englewood police would not normally charge someone with those offenses under similar circumstances. Detective **Glee** knew that the charge was pretextual, [Plaintiff's] speech was constitutionally protected, and the charge's only purpose was to punish" Plaintiff for her protected conduct. *Id*. ¶ 97.

- "The District Attorney ultimately dismissed the case because [Plaintiff's] actions were protected by the First Amendment." *Id*. ¶ 99.

### b.    Personal Participation of Defendants Sierra and Anderson

In support of dismissal, Defendants Sierra and Anderson argue that Plaintiff has failed to plausibly allege their personal participation. *Motion* [#50] at 7.

Here, Plaintiff broadly alleges that Defendants Sierra and Anderson, along with Defendants Niles and Glee, "retaliated against [Plaintiff] for [her protected expressive conduct] by orchestrating her charging, arrest, and prosecution based on the false allegations that her conduct at the city council meeting violated the law." *Am. Compl.* [#36] ¶ 140. However, nowhere in the Complaint does Plaintiff allege any facts to support this conclusion as to Defendants Sierra and Anderson.

As to Defendant Sierra, Plaintiff simply alleges that he interrupted her during the City Council meeting, demanded that she provide her city of residence, called for a break during the City Council meeting, and told Plaintiff her time had elapsed upon the conclusion of the break. None of these allegations enable the Court to reasonably infer that Defendant Sierra personally participated in the charging, arrest, and prosecution of Plaintiff in connection with her conduct at the City Council meeting. The allegations against Defendant Anderson are similarly deficient. In connection with this claim, Plaintiff alleges one thing: that Anderson "inaccurately" said that she "was violating the rules and suggested the Council take a break." *Id.* ¶ 87. And without any support, she alleges in a conclusory fashion that Defendant Anderson, along with the other Defendants, "orchestrat[ed] her charging, arrest, and prosecution[.]" *Id.* ¶ 140. This collective pleading and her conclusory allegations against Defendants Sierra and Anderson fail to pass muster. *See Pahls*, 718 F.3d at 1225; *Kan. Penn Gaming*, 656 F.3d at 1215. Because

Plaintiff has failed to allege that Defendants Sierra and Anderson violated a clearly established constitutional right, they are entitled to qualified immunity.

Accordingly, the Court **recommends** that Defendants' Motion [#50] be **granted in part** and Plaintiff's Claim 3 against Defendants Sierra and Anderson in their individual capacities be **dismissed without prejudice**.

### c.   Existence of Probable Cause and Pretext

Drawing on the analysis in sections III(A)(2)(b) and III(A)(2)(c), the Court concludes that Plaintiff has adequately alleged a retaliatory arrest claim against Defendants Niles and Glee, but not a retaliatory prosecution claim.

Plaintiff alleges that making a public comment at a City Council meeting is constitutionally protected activity. *See Mesa*, 197 F.3d at 1047. There is no question that arrest would have a chilling effect on that protected activity. As to retaliatory motive, Plaintiff alleges that the City Council did not enforce the address rule against other speakers. *Am. Compl.* [#36] ¶ 81. She alleges that that Defendant Niles submitted an inaccurate witness statement to law enforcement for the purpose of retaliating against Plaintiff for her speech, with which Niles disagreed. She also alleges that Defendant Glee sought an arrest warrant based on Niles's witness statement. And she further alleges that Defendant Glee knew that the charge was pretextual, that Plaintiff's speech was constitutionally protected, and that the purpose was to punish Plaintiff for her protected conduct. *Id*. ¶¶ 95-97.

Colo. Rev. Stat. § 18-9-110(4)[3] prohibits a person from "willfully imped[ing], disrupt[ing], or hinder[ing] the normal proceedings of such meeting or session by any act

---

[3] Although Plaintiff does not allege the statutory subsection under which she was charged, subsection (4) most closely applies to Plaintiff's alleged facts.

of intrusion into . . . areas designated for the use of the body or official conducting the meeting or session or [engaging in] any act designed to intimidate, coerce, or hinder any member of such body or official engaged in the performance of duties at such meeting or session." A reasonable officer could have believed that Plaintiff willfully disrupted the City Council's normal proceedings by engaging in an act designed to hinder Mayor Sierra's duties as the Presiding Officer of the meeting (namely, refusing to comply with the address rule when asked). Thus, probable cause existed for her arrest.

Nevertheless, pursuant to the *Nieves* exception, Plaintiff alleges that she was arrested under "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. at 406. Based on Plaintiff's well-pleaded allegations of retaliatory motive, the Court finds that Plaintiff has sufficiently alleged that her arrest was pretextual. The *Nieves* exception applies to the extent that Plaintiff asserts a theory of retaliatory arrest, but not as to her theory of retaliatory prosecution.

### d.    Qualified Immunity

For the reasons articulated in sections III(A)(2)(d)-(e), the Court finds that Defendants Niles and Glee are not entitled qualified immunity.

Accordingly, the Court **recommends** that Defendants' Motion [#50] be **denied in part** as to Plaintiff's Claim 3, to the extent that claim concerns retaliatory arrest and is asserted against **Defendants Niles** and **Glee in their individual capacities**.

### 4.    City Council Exclusion Order (Claim 4)

Plaintiff asserts First Amendment retaliation against the City and Defendants Sierra, Anderson, and Niles with respect to the City Council exclusion order.

### a.    Additional Background

Plaintiff alleges that Defendants Sierra, Anderson, and Niles issued the 45-day exclusion order to stop her exercise of her First Amendment rights. *Am. Compl.* [#36] ¶ 147. With respect to each of these Defendants, Plaintiff further alleges as follows:

- Defendant **Niles** "ensured [Plaintiff] would be punished for her protected speech at the City Council meeting" by "issu[ing] an exclusion notice barring [Plaintiff] from the room . . . where City Council meetings are held for 45 days for allegedly violating Englewood's 'Standards of Behavior' during her public comment at the Council meeting." *Id.* ¶ 94.

- **Niles** issued the exclusion order "because she disagreed with the content of [Plaintiff's] speech and wanted to retaliate against [Plaintiff] for her speech." *Id.* ¶ 94.

- "At the appeal of the exclusion order, City Attorney **Niles** testified and admitted that, before October 7, 2024, the City had not enforced its rule requiring a speaker to provide their address during public comment." *Id.* ¶ 100.

- **Niles** also admitted that, during her multi-year tenure as City Attorney, no one other than Plaintiff had been stopped in the middle of their public comment period. *Id.*

### b.    Personal Participation of Defendants Sierra and Anderson

To the extent Claim 4 is asserted against Defendants Sierra and Anderson, it has the same defect as Claim 3: Beyond collective pleading, Plaintiff fails to allege any facts rendering plausible their personal participation in the exclusion order. *Robbins*, 519 F.3d at 1250. The allegations, rather, are directed at Defendant Niles. Because Plaintiff has failed to allege that Defendants Sierra and Anderson violated a clearly established constitutional right, they are entitled to qualified immunity. Therefore, the Court **recommends** that Defendants' Motion [#50] be **granted in part** and Claim 4 should be **dismissed without prejudice** as to Defendants Sierra and Anderson in their individual capacities.

c.     **Sufficiency of Allegations Against Defendant Niles**

Turning to the allegations against Defendant Niles, Defendants seek dismissal on three grounds. First, they argue that Plaintiff's refusal to comply with the address rule and her speaking without permission violated the Englewood Municipal Code and the Englewood City Council Policies, and "Plaintiff did not have a constitutionally protected interest in attending City Council meetings where she repeatedly refused to comply with Municipal Code, the City Council policies, and [Englewood's] Standards of Behavior." *Motion* [#50] at 13. Second, they argue that "[a] 45-day exclusion from City Council meetings is unlikely to chill a person of ordinary firmness from attending future City Council meetings" and "it did not chill Plaintiff from attending many subsequent meetings." *Id*. Third, they argue that the Complaint contains "no allegations" that "Defendants intended to prevent Plaintiff from attending City Council meetings due to her views on the homeless community rather than to comply with established code, policies, and rules." *Id*.

In response, Plaintiff argues that the well-pleaded allegations show that Plaintiff was excluded from City Council meetings "because Defendants disagreed with the content of her speech and wanted to retaliate against her." *Response* [#63] at 10. Plaintiff also argues that whether her speech was chilled is immaterial because "courts apply an objective standard that 'permits a plaintiff who perseveres despite government interference to bring suit' but precludes claims based on a 'trivial or de minimus injury.'" *Id*. at 9 (quoting *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004)). Finally, Plaintiff argues that she "can show retaliatory motive through evidence of disparate application of a policy." *Id*. at 10 (citing *Cillio v. City of Greenwood Vill.*, 739 F.3d 451, 462 (10th Cir. 2013)).

The Court addresses Defendants' three arguments in turn. First, the Court agrees with Plaintiff that, at this stage of the proceedings, the Court is limited to the well-pleaded allegations within the Complaint's four corners. While discovery may ultimately prove up Defendants' theory—that Plaintiff was excluded from City Council meetings for 45 days because she violated municipal code and city council policies—the Court cannot consider Defendants' narrative unless it exists within the Complaint.

Second, because Plaintiff has alleged that Defendants acted in retaliation for her protected speech, the Court must apply an objective standard to evaluate whether Defendants' action had a chilling effect. *See Eaton*, 379 F.3d at 954. "The harm must be of the type that would chill a person of ordinary firmness from continuing to engage in the protected speech." *Id*. "[A]lthough the objective standard permits a plaintiff who perseveres despite governmental interference to bring suit, a trivial or de minimus injury will not support a retaliatory prosecution claim." *Id*. (internal citations and quotation omitted). The Court finds that exclusion from City Council meetings amounts to conduct that would chill a person of ordinary firmness because it deprived Plaintiff of a primary forum where her objections to various city policies could be heard by the Mayor, the Mayor Pro Tem, and other City Council members who had the power to change those policies. *See, e.g.*, *MacQuigg v. Albuquerque Pub. Schs. Bd. of Educ.*, No. 12-1137, 2015 WL 13650030, at *9 (D.N.M. Feb. 6, 2015) (reasoning that a factfinder could conclude that the indefinite exclusion from board of education meetings was more than a trivial or de minimus injury because it deprived the plaintiff of access to his primary forum).

Third, the Court finds that Plaintiff has plausibly alleged that Defendant Niles issued the exclusion order in retaliation for Plaintiff's protected speech. Although the

exclusion order allegedly referenced violations of Englewood's "Standards of Behavior," Plaintiff alleges that Defendant Niles admitted under oath that the City had not previously enforced the address rule and, to Niles's knowledge, no other speaker had been stopped in the middle of their public comment. *Am. Compl.* [#36] ¶¶ 94, 100; *see also id*. ¶ 81 (alleging that "City Council members publicly acknowledged that they did not enforce their own policy"); *id*. ¶ 82 (alleging that a city councilman stated during a public interview that the City Council had contemplated enforcing the address rule against Plaintiff to prevent her from speaking during Council meetings). Additionally, on several prior occasions, Plaintiff allegedly "refused to provide geographical information at the beginning of her public comment" without issue. *Id*. ¶ 80. Based on these allegations, the Court can reasonably infer that Defendant Niles's issuance of the exclusion order was substantially motivated as a response to Plaintiff's constitutionally protected conduct. Therefore, Plaintiff's Claim 4 should proceed to discovery, to the extent it is asserted against Defendant Niles.

### d.     Qualified Immunity

For the reasons articulated in sections III(A)(1)(f) and III(A)(1)(g), the Court finds that Defendant Niles is not entitled qualified immunity.

Accordingly, the Court **recommends** that Defendants' Motion [#50] be **denied in part** as to Plaintiff's Claim 4, to the extent that claim is asserted against **Defendant Niles** in her individual capacity.

### 5.     Denial of Public Comment (Claim 5)

Plaintiff asserts First Amendment retaliation against the City and Defendant Sierra with respect to her inability to make a public comment at the January 6, 2025 City Council

meeting. Specifically, Plaintiff alleges that she "signed up for public comment prior to the stated deadline," but that "Mayor Sierra ended the public comment period early without calling [Plaintiff] to speak." *See Am. Compl.* [#35] ¶ 105. Plaintiff further alleges that she was "the only person who was denied the opportunity to offer public comment at this meeting." *Id.*

In their quest for dismissal of this claim, Defendants argue that, according to a video of the City Council meeting, Plaintiff was denied permission to speak because she refused to comply with the address rule when she signed up to make the public comment. *Motion* [#50] at 10. Defendants continue, "[t]he First Amendment does not establish an absolute right to unlimited speech at City Council meetings" because "the City's public comment period is a limited public forum, where the City may impose viewpoint-neutral restrictions that are reasonable in relation to the forum's purpose." *Id.* at 10-11 (citing *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 44 (1983)). Defendants point to the address rule as a viewpoint-neutral restriction. *Id*. In response, Plaintiff argues that Defendants' "proffered non-retaliatory basis does not defeat Plaintiff's claim" because "Defendants only apply the address rule against Plaintiff[.]" *Response* [#63] at 10-11.

### a.    Judicial Notice of City Council Video

"Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence." *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). However, facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288,

1298 (10th Cir. 2025); *Hodgson v. Farmington City*, 675 F. App'x 838, 841 (10th Cir. 2017).

The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned.

FED. R. EVID. 201(b). Accordingly, courts may "take judicial notice of . . . facts which are a

matter of public record." *Tal*, 453 F.3d at 1265 n.24 (quoting *Van Woudenberg ex rel. Foor

v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000)). "However, '[t]he documents may only be

considered to show their contents, not to prove the truth of matters asserted therein.'" *Id.*

(quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

In *Petrowsky v. NextEra Energy Resources, LLC*, the District of Kansas noted that

"Federal Courts have . . . taken judicial notice of resolutions passed by local

governments." No. 17-1043-EFM-KGG, 2017 WL 2666361, at *6 (D. Kan. June 21, 2017).

The *Petrowsky* court cited cases from other jurisdictions where federal courts had taken

judicial notice of a City Council's meeting minutes and recordings of meetings. *Id.* at *6

n.28.

But in *Fuqua*, the Tenth Circuit declined to take judicial notice of dash-camera and

body-camera videos at the motion to dismiss stage. 157 F.4th at 1299. In so doing, it

noted that "if the district court had considered the videos, it would have had to weigh

evidence and make factual findings . . . when ruling on the motion to dismiss." *Id.* Doing

so would have "flouted" Rule 12(b)(6), which demands that the court's role is "not to weigh

potential evidence that the parties might present at trial, but to assess whether the

plaintiff's complaint alone is legally sufficient to state a claim for which relief may be

granted." *Id.* (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003)).

The Court concludes that, in this case, considering the City Council video would require the Court to weigh the evidence of what Mayor Sierra said against Plaintiff's allegations and to consider the truth of the matter asserted therein. For that reason, the Court declines to take judicial notice of the City Council video. *Id.* ("[Defendants] sought to use the videos to undermine and attack the veracity of the complaint. That's simply inappropriate on a motion to dismiss.").

On a motion to dismiss, the Court is limited to the allegations within the Complaint's four corners—not Defendants' reinterpretation of the allegations or the underlying events. *Cf. GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) (noting that a court may judicially notice a document attached to a motion to dismiss that was not incorporated by reference or attached to a complaint if "the document is referred to in the complaint and is central to the plaintiff's claim[.]"). At this stage, the Court must take Plaintiff's well-pleaded allegations as true.

### b.    Sufficiency of Allegations Defendant Sierra

Thus, absent the video of the City Council meeting, the Court returns to whether Plaintiff has plausibly alleged a prima facie case of First Amendment retaliation. The Court concludes that she has. In the First Amended Complaint [#36], Plaintiff alleges that she had been engaged in various constitutionally protected activities, including recording City Council meetings, engaging citizens and City employees on matters of public concern, speaking at City Council meetings, and submitting public records requests. *Am. Compl.* [#36] ¶ 152. She alleges that being the only speaker excluded from making a public comment would chill a person of ordinary firmness from continuing to engage in protected speech. *Id.* ¶ 155. Finally, she alleges that Defendant Sierra's actions were "substantially

motivated by [Plaintiff's] exercise of her First Amendment rights." *Id.* ¶ 154. For support, she alleged that a city councilman stated publicly that the City Council had contemplated using the address rule "specifically against [Plaintiff] to prevent her from speaking during City Council meetings" less than a year before this incident. *Id.* ¶ 82. For this reason, the Court finds that Plaintiff has plausibly alleged a prima facie case of First Amendment retaliation.

### c.    Qualified Immunity

For the reasons articulated in section III(A)(1)(f), the Court finds that Defendant Sierra is not entitled qualified immunity because, taking Plaintiff's allegations as true, he took an action against her in retaliation for her exercise of a constitutionally protected right. *Worrell*, 219 F.3d at 1214. Accordingly, the Court recommends that Defendants' Motion [#50] be **denied in part** as to Plaintiff's Claim 5 against Defendant Sierra in his individual capacity.

### d.    *Monell* Liability (Mayor Sierra as Final Policymaker at City Council Meetings)

With respect to her prohibition from making public comment, Plaintiff alleges that Mayor Sierra's act amounted to an official policy or custom of the City because he was acting with final policymaking authority. *Am. Compl.* [#36] at 23. The City moves to dismiss for failure to state a *Monell* claim. *Motion* [#50] at 5-6.

"[I]f an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes." *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995). Guiding inquiries for determining who is a "final policymaker" include whether the individual's decisions are (1) constrained by general policies enacted by others,

(2) reviewable by others, or (3) within the realm of the official's grant of authority. *Id.* at

448.

Plaintiff alleges that, with respect to deciding who is permitted to speak at City

Council meetings, Mayor Sierra acts with final policymaking authority. Thus, she

continues, his failure to allow her to speak amounts to an official policy conferring

municipal liability. Plaintiff alleges the following as grounds:

- "The Mayor is the Presiding Officer of the City Council." *Am. Compl.*
  [#36] ¶ 122.

- "The Presiding Officer calls City Council Meetings to order." *Id.*

- "The Presiding Officer is responsible for preserving order and decorum
  at City Council meetings." *Id.*

- "The Presiding Officer states all questions that are before the City
  Council, announces the decisions of City Council on all subjects, and
  signs all ordinances adopted by the City Council." *Id.*

- "The Presiding Officer determines questions of process and procedure."
  *Id.*

- "The Presiding Officer determines who can speak at a City Council
  meeting." *Id.*

- "No one can speak at a City Council meeting unless the Presiding Officer
  first gives them permission." *Id.*

The City responds that Plaintiff does not allege facts establishing the elements of a final

policymaker. *Motion* [#50] at 5. It argues that Plaintiff does not allege that Mayor Sierra is

*not* constrained by general policies enacted by others regarding who may speak at City

Council meetings or that Mayor Sierra's decisions regarding who may speak are *not*

reviewable by others. *Id.* The City directs the Court to policies establishing who may speak

at City Council meetings and how other City Council members may challenge Mayor

Sierra's decisions during a meeting by using a "Point of Order" appeal. *Motion* [#50] at 5.

In essence, Defendants ask this Court to discard Plaintiff's well-pleaded facts in favor of their own evidence that is neither central to, nor referenced in, Plaintiff's complaint. As discussed in sections III(A)(4)(c) and III(A)(5)(a), it would be impermissible for the Court to do so at the motion-to-dismiss stage. *See Fuqua*, 157 F.4th at 1299 (Identifying outside evidence to "undermine and attack the veracity of the complaint" is "simply inappropriate on a motion to dismiss.").

The Court finds that, although Plaintiff does not make specific allegations concerning the guiding inquiries of a final policymaker in so many words, she alleges just enough at this stage to establish that he is. Namely, Plaintiff alleges that Defendant Sierra "determines who can speak at a City Council meeting" and that "[n]o one can speak at a City Council meeting unless [he] first gives them permission." *Am. Compl.* [#36] ¶ 122. Thus, Plaintiff's Claim 5 against the City may proceed to discovery.

Accordingly, the Court **recommends** that the Motion [#50] be **denied in part** as to Plaintiff's Claim 5 against Defendant the City.

## B.    Conspiracy to Violate the First Amendment (Claim 6)

Plaintiff next asserts conspiracy to commit First Amendment retaliation against all Defendants.

"[A] conspiracy to deprive a plaintiff of a constitutional or federally protected right under the color of state law" is actionable. *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990). A conspiracy "requires the combination of two or more persons acting in concert." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994). To succeed on a conspiracy claim, Plaintiff must plead "not only a conspiracy, but also an actual deprivation of rights; pleading . . . of one without the other will be insufficient." *Snell*, 920 F.2d at 701.

"While more than mere conclusory allegations are required to state a valid claim, 'the nature of conspiracies often makes it impossible to provide details at the pleading stage and . . . the pleader should be allowed to resort to the discovery process and not be subject to dismissal of his complaint.'" *Brever*, 40 F.3d at 1126 (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, § 1233, at 257 (2d ed. 1990)).

Here, Plaintiff has alleged an "agreement among . . . participants to deprive the plaintiff[ ] of a constitutional right." *Snell*, 920 F.2d at 701. Specifically, she alleges an agreement among:

- Defendants Barnett, Lafferty, Mulder, Niles, and Renteria as to Plaintiff's Claim 1, *see* section III(A)(1);

- Defendants Barnett, Lafferty, Mulder, Niles, Renteria, and Glee as to Plaintiff's Claim 2, *see* section III(A)(2); and

- Defendants Niles and Glee as to Plaintiff's Claim 3, *see* section III(A)(3).

The Court finds that, as to each of these claims, Plaintiff alleges sufficient facts to create an inference of a "meeting of the minds" between the conspirators. *Brever*, 40 F.3d at 1127.

Defendants ask the Court to apply the "intracorporate conspiracy doctrine"—a legal theory prohibiting an inference of a conspiracy between a corporate entity and its agents. *See Motion* [#50] at 7. In *Brever*, the Tenth Circuit declined to extend the doctrine to an entity and its employees in the civil rights context. 40 F.3d at 1127 ("In these situations, the action by an incorporated collection of individuals creates the group danger at which conspiracy liability is aimed, and the view of the corporation as a single legal actor becomes a fiction without a purpose." (internal quotation marks and citation omitted)). In *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017), the United States Supreme Court,

noting a split among the circuits, reserved for "some later case" the question of whether the intracorporate conspiracy doctrine applies in civil rights actions. Thus, this Court follows the well-established law in the Tenth Circuit that the intracorporate conspiracy doctrine does not bar Plaintiff's conspiracy claim.

For the reasons discussed in sections III(A)(1)(e), III(A)(3)(b), and III(A)(4)(b), Plaintiff has not adequately alleged the personal participation of Defendants Watson, Sierra, or Anderson in a retaliatory scheme amongst multiple conspirators. Further, Plaintiff makes no allegation of Defendant Lewis's personal participation in any conspiratorial retaliation. Therefore, Defendants Watson, Sierra, Anderson, and Lewis are entitled to qualified immunity in connection with Claim 6.

Accordingly, the Court further **recommends** that the Motion [#50] be **denied in part** as to Plaintiff's Claim 6 to the extent that it is asserted against the City and Defendants Barnett, Lafferty, Mulder, Glee, Niles and Renteria in their individual capacities. The Court also **recommends** that the Motion [#50] be **granted in part** and Plaintiff's Claim 6 be **dismissed without prejudice** as to Defendants Watson, Sierra, Anderson, and Lewis in their individual capacities.

## C. State Law Claim Against Defendants Mulder and Glee (Claim 7)

Plaintiff asserts Claim 7 pursuant to Article II, Section 10 of the Colorado Constitution, a state analogue to the First Amendment, and Colo. Rev. Stat. § 13-21-131, a state analogue to the federal § 1983 cause of action but under which qualified immunity is unavailable. *Am. Compl.* [#36] at 31. She asserts that Defendants Mulder and Glee violated her rights of freedom of speech and freedom of association. *Id.* Because Plaintiff

alleges that these claims arise from the same case or controversy as her federal § 1983 claim, the Court's jurisdiction over these claims is supplemental, under 28 U.S.C. § 1367.

The Colorado Constitution provides: "No law shall be passed impairing the freedom of speech." COLO. CONST. art. II, § 10. To give effect to the Constitution's Bill of Rights, Colo. Rev. Stat. § 13-21-131(1) provides:

> A peace officer . . . who, under color of law, subjects . . . any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

"Qualified immunity is not a defense to liability pursuant to this section." COLO. REV. STAT. § 13-21-131(2)(b).

Defendants argue that Plaintiff's Claim 7 fails for two reasons. First, Plaintiff has made no allegations concerning her freedom to associate. *Motion* [#50] at 15. Second, Defendants Mulder and Glee did not violate Plaintiff's rights because probable cause existed for her arrest under each of the statutes under which she was charged. *Id.* In response, Plaintiff appears to concede the first point; she focuses her arguments on Defendants Mulder and Glee's violations of her right to free speech. *Response* [#63] at 17.

For the reasons articulated in sections III(A)(2)(c) and III(A)(3)(c), the existence of probable cause does not necessarily foreclose Plaintiff's claims. Namely, pursuant to the *Nieves* exception, Plaintiff alleges that she was arrested under "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. at 406. Based on the Plaintiff's well-pleaded allegations of retaliatory motive, the Court finds that Plaintiff has established that her arrests were pretextual.

Accordingly, the Court **recommends** that the Motion [#50] be **denied in part** as to Plaintiff's Claim 7.

**D.      First Amendment Claims (Claims 8, 9, and 10)**

Plaintiff asserts violations of her First Amendment rights with respect to (1) the library exclusion order against Defendants Mulder, Niles, Renteria, Barnett and Lafferty; (2) the City Council exclusion order against Defendants Sierra, Anderson, and Niles; and (3) the denial of public comment at the January 6 City Council meeting against Defendant Sierra.

To state a claim for violation of the First Amendment and First Amendment retaliation based upon the same conduct, a plaintiff must assert "distinct legal theor[ies]" supporting the claims. *See Weise v. Colorado Springs*, 421 F. Supp. 3d 1019, 1039 (D. Colo. 2019). If state actors do not take "preemptively proscriptive action" constituting a content-based restriction on speech, and instead only act "in response to the activities that Plaintiff contends were constitutionally protected," the First Amendment violation claim is duplicative of a First Amendment Retaliation claim. *See Sexton v. Faris*, No. 22-cv-1927-WJM-MEH, 2023 WL 5671492, at *7 (D. Colo. Sept. 1, 2023). But a plaintiff may successfully plead a distinct claim for relief where the alleged retaliatory conduct can itself be considered a content-based restriction on speech. *See Irizarry v. City & County of Denver*, 661 F. Supp. 3d 1073, 1092 (D. Colo. 2023) (holding that an arrest, for example, "can give rise to a content-based restriction on free speech"); *Sexton*, 530 F. Supp. 3d at 1065 (same).

Here, Plaintiff's free speech claims fail because Plaintiff has failed to identify a content-based restriction acting as a prior restraint or challenge a specific law, regulation,

or policy restricting her ability to speak. *See Sodaro v. City & County of Denver*, 629 F.

Supp. 3d 1064, 1078 (D. Colo. 2022) ("Absent this showing, and considering that all of

the [o]fficers' actions occurred *in response* to the activities that [the] [p]laintiff contends

were constitutionally protected, the [c]ourt is uncertain how it could analyze [the]

[p]laintiff's claim as anything but a claim for retaliation."); *see also Sexton*, 2023 WL

5671492, at *7; *Weise*, 421 F. Supp. 3d at 1039-40.

Thus, finding that Plaintiff has failed to state actionable First Amendment claims,

the Court **recommends** that the Motion [#50] be **granted** and that Plaintiff's Claims 8, 9,

and 10 be **dismissed without prejudice**. *See Sodaro*, 629 F. Supp. 3d at 1078

(dismissing without prejudice duplicative First Amendment claim).

## E.    First Amendment Overbreadth (Claim 11)

Finally, Plaintiff asserts that the City's "Administrative Order Prohibiting Video

Recording Without Consent" is unconstitutionally overbroad in violation of the First

Amendment. *Am. Compl.* [#36] at 36. She asserts this claim against the City and

Defendant Lewis, who allegedly enacted the Administrative Order. *See id*. ¶¶ 106, 110.

Plaintiff alleges that the Order provides as follows:

> Effective 10/28/24 at 8:00 a.m., no one may video record without the
> consent of all persons whose voice or image is recorded, within eight (8)
> feet of entrances or inside the Englewood Civic Center, Pirates Cove, or
> other buildings owned and operated by the City of Englewood (collectively
> "City buildings").
>
> Exceptions
> * This Order shall not apply to:
>     1. Any room during a meeting subject to the Colorado Open
>        Meetings Law;
>     2. Law enforcement and other City public safety officials while
>        performing their official duties;
>     3. Recording of law enforcement officials while performing their
>        official duties;

4. Security cameras; or
5. Recording which is otherwise specifically authorized, required, or prohibited by applicable law or Court order, including regarding Englewood Municipal Courtroom, pursuant to the Court's June 16, 2017 Standing Order Regarding Electronic Devices in Courtroom.

- Any party renting space within a City building may modify this Order within the rental space, during the rental period.

*Id.* ¶ 107. Defendants incorporate their arguments from their previously filed Motion to Dismiss [#25] in connection with Plaintiff's initial Complaint [#1]. *See Motion* [#50] at 9.

"[A] law may be invalidated as overbroad 'if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Streett*, 83 F.4th 842, 852 (10th Cir. 2023) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). "Invalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). "The overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact' that substantial overbreadth exists." *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)).

The overbreadth analysis has two steps. First, a court construes the challenged statute to determine whether it covers protected speech. *Id.* Second, a court determines whether the unconstitutional applications of the statute are substantially disproportionate to the statute's lawful sweep. *Id.* For the statute to be unconstitutionally overbroad, its "unconstitutional applications must be realistic, not fanciful[.]" *Id.*

**1.    Protected Speech**

To determine whether an activity is protected by the First Amendment, a court "must first identify whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First

Amendment activities within the forum." *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016). "The [Supreme] Court has identified three types of speech fora: the traditional public forum, the designated public forum, and the nonpublic forum." *Id.* at 1129.

"Traditional public fora are places that by long tradition have been open to public assembly and debate." *Id.* "The Supreme Court has long recognized 'that public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums.'" *Id.* at 1138 (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)). "In these traditional public fora, the government's right to limit expressive activity [is] sharply circumscribed." *Id.* at 1129 (internal quotation marks and citation omitted).

"A designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity." *Id.* "The government is not required to retain the open character of the property indefinitely, but 'as long as it does so, it is bound by the same standards as apply in a traditional public forum.'" *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 46 (1983)).

If a property is not a traditional public forum or a designated public forum, then it is a nonpublic forum. *Id.* "Access to a nonpublic forum . . . can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (internal quotation marks and citation omitted).

Defendants argue "[t]he areas restricted by requiring consent before filming are all nonpublic forums where the City either manages its internal operations, are government

workplaces, or are only selectively open to community members paying a fee for the enjoyment of unobstructed access to City recreational activities." *Motion to Dismiss* [#25] at 9-10. Thus, Defendants continue, the Administrative Order is constitutional so long as it is view-point neutral and reasonable in light of its purpose. *Id.* at 10.

The Court disagrees with Defendants. First, Plaintiff's Complaint, by which the Court is bound, alleges that the Administrative Order prohibits speech creation in traditional public forums. *Am. Compl.* [#36] ¶¶ 201-02. Further, the Administrative Order, by its own terms, bars filming without consent "within eight (8) feet of entrances" of City buildings. *Id.* ¶ 107. The sidewalk outside of a public building "[is] considered, without more, to be [a] public forum[]." *Verlo*, 820 F.3d at 1138. As discussed in section III(A)(1)(b), filming in traditional public forums is protected speech creation. *Irizarry*, 38 F.4th at 1289, 1292; *W. Watersheds Project*, 869 F.3d at 1196-97; *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1235-36 (10th Cir. 2021). Moreover, a public library is generally considered a designated public forum, not a nonpublic forum, as Defendants claim. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1128-29 (10th Cir. 2012).

For this reason, the Court finds that the Administrative Order covers at least some protected speech.

### 2.    Substantial Sweep

However, determining whether the unconstitutional applications of the statute are substantially disproportionate to the statute's lawful sweep presents problems at this stage in the proceedings. First, the Court has only limited information about the nature of the City buildings at issue in the Administrative Order. The Order applies to the entrance and inside of "the Englewood Civic Center, Pirates Cove, or other buildings owned and

operated by the City of Englewood." *Am. Compl.* [#36] ¶ 107. According to Plaintiff's Complaint, the Civic Center building houses the library and the room where City Council meetings are held. But the Court cannot infer, at this stage in the proceedings, how many other forums exist within the building, and the extent to which they are traditional, designated (or limited), or nonpublic. Further, the Court has no information about "Pirates Cove" or "other buildings owned and operated by" the City. Some discovery is required to determine the nature of these spaces before the Court can consider the extent to which filming in those spaces is protected speech.

Second, to the extent that the Administrative Order provides certain exceptions, such as "meetings subject to the Colorado Open Meetings Law," or "[r]ecording of law enforcement officials while performing their official duties," the Court does not presently have enough information to determine whether those exceptions are sufficiently comprehensive to limit the Order's unconstitutional applications. For example, consider Plaintiff's argument that "[v]arious public meetings—including meetings not subject to the Open Records Act and therefore falling outside the ordinance's carveout for meetings subject to that Act—are held in the Civic Center building." *Response* [#63] at 19. Discovery would help flesh out the exceptions and their practical implications.

Third, to the extent that Plaintiff alleges that the Administrative Order was passed specifically to restrict *her* speech, the Order may not pass muster even as to the portions of City buildings that are nonpublic forums. *See Verlo*, 820 F.3d at 1129 ("Access to a nonpublic forum . . . can be restricted as long as the restrictions are reasonable *and are not an effort to suppress expression merely because public officials oppose the speaker's view*.") (emphasis added).

For these reasons, Plaintiff has alleged enough at this stage for her Claim 11 to proceed to discovery. Accordingly, the Court **recommends** that the Motion [#50] be **denied in part** as to Plaintiff's Claim 11.

## F.    *Monell* Liability/Official Capacity Claims

Defendants argue that Plaintiff's official capacity claims should be dismissed as duplicative of her claims against the City. *Motion* [#50] at 2. Plaintiff does not address this argument in her Response [#63]. The Court agrees with Defendants. Official capacity claims against a municipal employee are treated as a suit against the municipality itself. *See Johnson v. Bd. of Cnty. Comm'rs*, 85 F.3d 489, 493 (10th Cir. 1996); *Mullins v. City of Colorado Springs*, 575 F. Supp. 3d 1360, 1367 (D. Colo. 2021) (dismissing without prejudice official capacity claims against individual officers as duplicative of claims against the city). Therefore, the Court **recommends** that the Defendants' Motion [#50] be **granted in part** and the official capacity claims against the individual Defendants be **dismissed without prejudice**.

As for the City, it moves to dismiss for failure to state a *Monell* claim pursuant to Fed. R. Civ. P. 12(b)(6). *Motion* [#50] at 2-6 (referencing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978)).

A municipality "is a 'person' subject to § 1983 liability." *McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir. 2014) (citing *Monell*, 436 U.S. at 690-91). "A core principle of *Monell* liability is that municipal entities are liable for only their own actions and not vicariously liable for the actions of their employees." *Crowson v. Washington County*, 983 F.3d 1166, 1191 (10th Cir. 2020). However, "[b]ecause municipalities act through officers, ordinarily

there will be a municipal violation only where an individual officer commits a constitutional violation." *Id.*

"Municipal liability requires an underlying constitutional violation." *Buchanan v. Turn Key Health Clinics, LLC*, No. 22-7029, 2023 WL 6997404, at *7 (10th Cir. Oct. 24, 2023). In addition to the requirement that there be a constitutional violation, a plaintiff must adequately allege three other elements to state a municipal liability claim: "(1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023).

Regarding the first element, an official policy or custom may include:

(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & County of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (citation omitted).

Plaintiff alleges that she has adequately pleaded that the City has a "custom, policy, or practice" of retaliating against her for exercising her First Amendment right to criticize the City. *Compare First Am. Compl.* [#36] at 22-23, *with Response* [#63] at 12. The City responds that Plaintiff's claims fail on the first element; namely, that Plaintiff does not plausibly allege the existence of a widespread practice. *Motion* [#50] at 3.

"A custom is a 'persistent and widespread' practice which 'constitutes the standard operating procedure of the local governmental entity.'" *Mitchell v. City & County of Denver*, 112 F. App'x 662, 672 (10th Cir. 2004) (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S.

701, 737 (1989)). To establish a custom, the municipal employees' actions must be "continuing, persistent and widespread." *Carney v. City & County of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quoting *Gates v. Unified Sch. Dist. No. 449,* 996 F.2d 1035, 1041 (10th Cir.1993)). Plaintiffs "most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id.* Indeed, a plaintiff's failure to allege similar First Amendment violations against others "seriously undermines" her claim that the City maintains a custom, policy, or practice of First Amendment retaliation. *See Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (collecting cases). Thus, while not a requirement, evidence of the City's similar treatment of others strengthens a municipal liability claim. When a plaintiff pleads "a pattern of multiple similar instances of misconduct," no "set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible." *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1070 (D. Colo. 2021) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).

Citing *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1276 (D. Colo. 2018), Plaintiff contends that a pattern of retaliation against a specific person can amount to an official policy or custom within the meaning of *Monell*. In *Brandt*, the Court found a triable issue of fact as to whether a municipality had a widespread custom of "criminalizing [the plaintiff's] protected speech" and "arresting [him] for engaging in First Amendment activity." *Id.* at 1276. The court concluded that—where the police department cited or arrested Brandt 24 times and where Brandt was well known throughout the department— a reasonable jury could infer that police contact in question was "consistent with a

municipal custom, policy, or practice of citing, arresting, or harassing Brandt *individually*[.]" *Id.* at 1276 (emphasis added).

Here, Plaintiff alleges that several City employees—including top officials—had a hand in her two exclusions from City public spaces and her two arrests over the course of six months. True, Plaintiff did not allege similar First Amendment violations against others. Nor does she allege police contacts in a quantity commensurate with that in *Brandt*. Those facts may ultimately undermine her claim that the City maintains a widespread practice of First Amendment retaliation. But at this point in the litigation, the Court finds that, pursuant to *Brandt*, Plaintiff has pleaded just enough for her theory of municipal liability to survive the City's Motion [#50].

For these reasons, the Court **recommends** that Defendants' Motion [#50] be **denied** with respect to the claims against the City (Claims 1-6 and 11).

## IV.    Conclusion

IT IS HEREBY **RECOMMENDED** that the Defendants' Motion to Dismiss [#50] be **GRANTED in part and DENIED in part**.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **DENIED** as to Plaintiff's Claim 1 insofar as it concerns the City and Defendants Lafferty, Barnett, and Mulder, Niles, and Renteria in their individual capacities and **GRANTED** insofar as it concerns Defendant Watson in her individual and official capacities.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **DENIED** as to Plaintiff's Claim 2 insofar as it concerns Plaintiff's retaliatory arrest theory against the City and Defendants Niles, Renteria, Barnett, Lafferty, Mulder, and Glee in their individual

capacities and **GRANTED** insofar as it concerns Plaintiff's retaliatory prosecution theory and that part of Claim 2 be **dismissed without prejudice**.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **DENIED** as to Plaintiff's Claim 3 insofar as it concerns the City and Defendants Niles and Glee in their individual capacities as it concerns Plaintiff's retaliatory arrest theory, **GRANTED** as to Plaintiff's retaliatory prosecution theory, and **GRANTED** insofar as it concerns Defendants Sierra and Anderson in their individual capacities.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **DENIED** as to Plaintiff's Claim 4 insofar as it concerns the City and Defendant Niles and **GRANTED** insofar as it concerns Defendants Sierra and Anderson in their individual capacities.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **DENIED** as to Plaintiff's Claim 6 insofar as it concerns the City and Defendants Barnett, Lafferty, Mulder, Glee, Niles and Renteria and **GRANTED** insofar as it concerns Defendants Watson, Lewis, Sierra, and Anderson in their individual capacities.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **DENIED** as to Plaintiff's Claims 5, 7, and 11.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **GRANTED** as to Plaintiff's Claims 8, 9, and 10.

IT IS FURTHER **RECOMMENDED** that the Motion [#50] be **GRANTED** as to the official capacity claims against the individual Defendants.[4]

---

[4] If this Recommendation is adopted, the following claims will remain: (1) Claim 1 (First Amendment Retaliation: Library Exclusion Order) against the City and Defendants Lafferty, Barnett, Mulder, Niles, and Renteria; (2) Claim 2 (Retaliatory First Arrest) against the City and Defendants Niles, Renteria, Barnett, Lafferty, Mulder, and Glee; Claim 3 (Retaliatory Second Arrest) against the City and Defendants Niles and Glee; Claim 4 (Retaliatory City Council Exclusion Order) against the City and Defendant Niles; Claim 5 (Retaliatory Denial of Public

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Federal Rule of Civil Procedure 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A] party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: February 17, 2026          BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge

---

Comment) against the City and Defendant Sierra; Claim 6 (Conspiracy to Violate the First Amendment) against the City and Defendants Barnett, Lafferty, Mulder, Glee, Niles, and Renteria; Claim 7 (State Law Claim) against Defendants Mulder and Glee; and Claim 11 (First Amendment Overbreadth) against the City and Defendant Lewis.